**Burdette WOODS, Petitioner-Appellee,**

v.

**Donald CLUSEN, Respondent-Appellant.**

**No. 85–1618.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1985.

Decided June 25, 1986.

6. The court appreciates the services of Susan G. Feibus as appointed counsel for petitioner Leroy Smith, Jr.

William J. Tyroler, Wis. Public Defender, Milwaukee, Wis., Jack E. Schairer, Asst. Public Defender, Madison, Wis., for petitioner-appellee.

Sally Wellman, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for respondent-appellant.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and CAMPBELL, Senior District Judge.*

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

WILLIAM J. CAMPBELL, Senior District Judge.

Petitioner Burdette Woods pled guilty and was subsequently adjudged guilty of second degree murder and manslaughter in the Circuit Court for Shawano County, Wisconsin for the beating death of Henry and Beryl Schwab. An oral confession obtained from Woods while in police custody played a pivotal role in petitioner pleading guilty. Prior to pleading guilty Woods brought a motion to suppress the oral confession. The trial court denied the motion. Woods took direct appeal to the Court of Appeals of Wisconsin pursuant to Wisconsin Statute § 971.31(10). The Court of Appeals affirmed in an unpublished order. Subsequently the Wisconsin Supreme Court reviewed the circumstances surrounding the confession and affirmed the rulings of the lower tribunals. See *State v. Woods*, 117 Wis.2d 701, 345 N.W.2d 457 (1984). Woods then petitioned for habeas corpus relief pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin, 605 F.Supp. 890. Judge Myron Gordon applied a "totality of circumstances" analysis to the facts surrounding the obtaining of the oral confession and concluded the police violated federal constitutional safeguards. He granted habeas corpus relief. We now review the district court ruling pursuant to 28 U.S.C. § 1291. We affirm Judge Gordon's ruling.

On September 10, 1979, Henry and Beryl Schwab were beaten to death in their Shawano County home. While local police were investigating the murder scene petitioner Woods was observed watching the events unfold from a distance. His presence and interest caused him to become a prime suspect. However, several days into the investigation police had no probable cause to arrest him.

Shortly thereafter police received information that petitioner had attempted to sell

a stolen chain saw to a local resident approximately seventeen months earlier. Police obtained a statement to this effect from the person to whom the sale was attempted. Lacking the requisite probable cause to arrest Woods for the Schwab murders, the police decided to arrest petitioner on a theft charge in order to bring him into custody to question him about the Schwab incident. On September 23, 1979 at 7:30 a.m. Shawano police officers Trombi and Thorpe drove to the trailer of petitioners' grandparents where the sixteen and one-half year-old Woods lived. After gaining entrance with the consent of a family member, the police walked into petitioner's bedroom and awakened and arrested him. Woods was handcuffed and placed in a police car.

While in transit to police headquarters petitioner was read his *Miranda* rights and asked if he understood them. Woods responded affirmatively. Woods was also asked if he wished to consult an attorney to which he answered in the negative. When asked if he would like to answer any questions or make a statement Woods did not respond. Woods arrived at police headquarters at approximately 8 a.m. A juvenile intake worker, David Gage, asked Woods many of the same questions concerning his understanding of his *Miranda* rights and his opportunity to consult an attorney. Woods continued to state he understood his rights and did not wish the presence of counsel. At this point Woods was fingerprinted, photographed and asked to remove his clothes and don jail overalls. He was not issued shoes or socks and was left barefoot.

After approximately forty-five minutes the booking process was completed and Woods was taken to a room to be interrogated by Officers Thorpe and Trombi. Woods was seated at a table, still barefoot and dressed in jail clothing but unrestrained. Approximately one to two feet away from Woods were pictures of the Schwab murder scene. Officers Thorpe and Trombi did not repeat the *Miranda* warnings to Woods. They did ask several times if Woods was willing to talk to them.

The petitioner never responded. Without Woods' explicit consent the officers proceeded to interrogate Woods about the Schwab case for approximately fifteen to twenty minutes. Several intimidating and deceptive tactics were employed by the officers to get Woods to talk. First, there were the disturbing pictures of the murder scene and the jail house clothing. In addition to this, Officer Thorpe misrepresented that police officials had enough evidence to convict Woods regardless of whether he talked. The officers admit this statement was not true. Officer Trombi further suggested things would "be better" or "go easier" if Woods talked, in view of the fact he knew Woods committed the murders. Trombi testified petitioner became visibly emotional during the interrogation. At one point when Officer Trombi asked petitioner why he was in the woods the day after the murders Woods responded, "I never went in the woods the next day." Nonetheless, except for this statement and despite the police tactics mentioned above Woods, although clearly emotionally involved, remained unresponsive.

Having reached an apparent impasse, Officers Trombi and Thorpe left the room. Two fresh investigators, Robert Ankenbrandt and Wendell Harken of the Wisconsin Division of Criminal Investigation, entered the interrogation room to commence their own interrogation. Harken asked Woods if he had been advised of his rights and Woods replied affirmatively. Harken and Ankenbrandt then initiated their own questioning. More deceptive tactics were employed to elicit an incriminating response from Woods during this second interrogation. Agent Ankenbrandt testified he produced a fingerprint card with two prints circled in red and the wallet of one of the murder victims and declared to Woods, "this is what is going to pin you down, or this is what's going to hang you, or something to that effect." Tr. 41. Ankenbrandt admits this statement was untrue and intentionally advanced to trick Woods into confessing. Indeed, no fingerprints were found on the wallets of the victims.

After twenty to thirty minutes of continuous interrogation, Woods began to cry. Agent Harken then put his hand on Woods' shoulder in a paternal manner. It was at this point Woods orally confessed to the Schwab murders.[1]

In this case we are asked to determine whether petitioner Burdette Woods knowingly and voluntarily waived his right to remain silent as well as his right to counsel within the spirit of the Fifth and Fourteenth Amendments to the United States Constitution. Were the conduct and tactics employed by police officials so psychologically overwhelming and offensive that they violated Woods' Fifth Amendment privilege against compelled self-incrimination and the Due Process Clause of the Fourteenth Amendment? Did the police actions remain within constitutionally permissible bounds and did Woods, by his course of conduct, waive his rights and decide to confess willfully, rationally and freely? We conclude the conduct of the police under the circumstances of this case violated the constitutional principles and safeguards which have been enunciated in past Supreme Court caselaw. The habeas corpus relief granted at the district court level was appropriate.

An individual has a right to be free from compelled self-incrimination while in police custody under the Fifth and Fourteenth Amendments to the United States Constitution. (See generally *Miranda v. State of Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966)). To safeguard this principle an individual, when placed under arrest by police officers, is given the *Miranda* warnings: that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires. An individual can waive the above rights provided a court finds the waiver was

knowingly, intelligently and voluntarily made. (See *Miranda*, supra, 384 U.S. at 479, 86 S.Ct. at 1630; see also *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979)). If police interrogation continues without the presence of an attorney and a statement is obtained from an individual "... a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege ... a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, supra, 384 U.S. at 475, 86 S.Ct. at 1628. "... the determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197 (1979) (citing *Miranda*, supra). "This totality of the circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Fare*, supra, 442 U.S. at 725, 99 S.Ct. at 2572. "The totality approach ... includes evaluation of the juvenile's age, experience, education, background, and intelligence, and (inquiry) into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.* (parentheses added). Further, "... authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of 'confessions' by children." *In re Gault*, 387 U.S. 1, 52, 87 S.Ct. 1428, 1456, 18 L.Ed.2d 527 (1967) (citing *Haley v. State of Ohio*, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948)). "We appreciate that special problems may arise with respect to

---

**1.** Woods subsequently signed a written confession as well. However, it was suppressed at the state trial court level and therefore any issues surrounding its procurement are not presented on appeal.

waiver of the privilege (against self-incrimination) by ... children ... If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." *Gault*, supra, 387 U.S. at 55, 87 S.Ct. at 1458. (parentheses added).

■ A review of the totality of the facts and circumstances surrounding this case does not leave us with the impression the constitutional principles and values enunciated by the Supreme Court above were respected in any acceptable manner. The police simply overreached in this case. We note the following particulars, to be reviewed in a "totality of circumstances" framework. Petitioner Woods was a juvenile sixteen and one-half years of age. He had no prior criminal record and certainly no serious previous contact with the criminal justice system. He was awakened early one morning by police officers hovering in his bedroom, handcuffed and led away from home and family in a matter of moments ostensibly for the theft of a chain saw. Upon his arrival at the police station he was stripped of his clothes, given institutional garb, but not given shoes—enhancing his feelings of powerlessness and vulnerability.[2] Woods was fingerprinted and photographed and led to an interrogation room where, once seated, he was immediately confronted with graphic (if not gruesome) pictures of the Schwab murder scene. Woods was then subjected to an extensive fifteen to twenty minute interrogation by two experienced (adult) police officers to which he never consented.[3] Except for one statement which police officials would be quick to admit was an obvious slip, Woods obviously had little inclination to speak to either of these officers. With this in mind his silence when asked if he would like to talk could just as easily be read as confusion and a lack of understanding as to what was happening and what to do.[4] The officers also intentionally made misrepresentations to Woods about the sufficiency of evidence against him. Officer Trombi's statement to the juvenile that it would "be better" if Woods talked was dubious advice to the ignorant, as any minimally competent defense counsel would be quick to attest.

After all of this tactical maneuvering and chicanery on the part of the police, two fresh police agents arrived upon the scene. While these officers were "fresh" Woods was already several hours into the ordeal. Without the presence of counsel one can only imagine what kind of convoluted thoughts were racing through Woods' mind at this point. The two new agents commenced what was to be a twenty to thirty minute interrogation. One of the agents lied to Woods by telling him they found his fingerprints on the wallet of one of the victims. This false evidence was followed by clearly intimidating statements such as "this is what is going to pin you down, or ... hang you." Agent Harken's fatherly overtures lacked sincerity and served to confuse the issue further for Woods. They hindered Woods' ability to make a knowing and voluntary choice concerning his exercising his option to waive his rights.[5]

2. The state claims the room was warm and petitioner was asked if he wanted food or drink or to use the restroom. We do not view these facts as positive overtures in view of the otherwise harsh setting.

3. We repeat the *Miranda* quote selected by the district court: "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated." 384 U.S. at 487, 86 S.Ct. at 1630.

4. "... a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, supra, 384 U.S. at 475, 86 S.Ct. at 1628.

5. In *Haley*, supra, the Supreme Court stated: "... when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy ... [H]e cannot be judged by the more exacting standards of maturity. That which would leave a

Woods' confession ended the second interrogation after approximately one-half hour, yet one wonders how long the attempt to squeeze a confession from Woods could have lasted? Certainly, Woods must have wondered if and when the inquisition would ever cease.[6] We do not mean to infer that every aspect of police conduct referred to above, when weighed individually, reaches suppressible proportions but we do not hesitate to conclude that the actions of the police in this case, when weighed together in a "totality of circumstances" analysis are offensive and violative of the constitutional principles and values set forth by the Supreme Court in cases such as *Miranda, Butler, Fare* and *Gault,* supra.

In *Gault,* supra, the Supreme Court stated that when juveniles are involved "the greatest care must be taken to assure that the admission was voluntary." See 387 U.S. at 55, 87 S.Ct. at 1428, 1455. In this case such care was nonexistent. It is a long-standing principle that great care is necessary to insure the voluntariness of a confession when juveniles are involved. We return to the language of *Haley,* supra, where the Supreme Court stated:

But we are told that this boy was advised of his constitutional rights be-

fore he signed the confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain. *Id.* 332 U.S. at 601, 68 S.Ct. at 304.

We share the same concern about juveniles in police custody in this case as the Supreme Court did in 1948. The statements obtained under the circumstances of the instant case should have been suppressed. There was little meaningful effort by the police in this case to uphold and respect the above constitutional principles and safeguards. The police tactics violated the Fourteenth Amendment's guarantee of fundamental fairness.[7]

---

man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year old lad, questioned ... by relays of police, is a ready victim for the inquisition. Mature men might stand the ordeal ... [B]ut we cannot believe a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, may not crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour ... [N]o lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning." *Id.* 332 U.S. at 599–600, 68 S.Ct. at 303–304.

6. We agree with the district court when it states, "The police are not ... licensed to grill the silent suspect." (D.Ct.Op. p. 11.)

7. We feel compelled to distinguish the instant case from *Moran v. Burbine,* — U.S. —, 106

S.Ct. 1135, 89 L.Ed.2d 410 (1986). In *Moran* the issue was whether the police's failure to notify a suspect of an attorney's telephone call and offer of representation deprived the suspect of his capacity to knowingly waive his Fifth Amendment right to the presence of counsel. In *Moran* the voluntariness of the suspect's confession was not at issue. There was no evidence police used any coercion and/or psychological pressure in securing the incriminating confessions. Indeed, it was the suspect who initiated the discussion with police which led to the damaging confession. The Court ruled that since the receipt of the attorney's telephone call by police was never known to the suspect, the police's conduct in failing to inform him of an attorney's call had no practical effect on the suspect's knowing waiver of his right to counsel.

In contrast, in the case at bar we are concerned with a custodial police interrogation involving a juvenile where rather intense psychological pressure was employed. We rule today the police conduct in the instant case fatally tainted the voluntariness of Woods' confession by hindering his ability to make a rational, voluntary waiver of his Fifth Amendment privilege against compelled self-incrimination.

■ The state claims the district court erred because it applied the wrong standard of review and burden of proof in adjudicating petitioner's claim for habeas corpus relief. We disagree. Concerning the state's standard for review argument, we do not believe the district court made a wholly independent determination of the "historical facts" of this case before proceeding to its "totality of the circumstances" analysis in order to find the petitioner's confession involuntary. Not only did the district court imply the mandatory presumption of correctness to the state court's findings of fact as required under 28 U.S.C. § 2254(d), as we see it no material facts as found by the state court were altered by the district court. Indeed, the facts of this case as to what happened to petitioner from the time of his arrest until the time of his confession are undisputed. The district court acted quite appropriately in this case in accepting the state's finding of the "historical facts" (although ultimately it need not do so if they are not supported by the record under 28 U.S.C. § 2254(d)(8)). The district court then appropriately applied these facts to rule as to whether the confession was voluntary as a matter of federal constitutional law. We emphasize it was the district court's duty to make an independent ruling as to voluntariness. As Justice O'Connor recently stated in *Miller v. Fenton,* —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985):

> Without exception, the Court's confession cases hold that the ultimate issue of "voluntariness" is a legal question requiring independent federal determination. As recently as 1978, the Court reaffirmed that it was "not bound by" a state-court voluntariness finding and reiterated its historic "duty to make an independent evaluation of the record." That duty ... is not limited to the instances in which the claim is that the police conduct was "inherently coercive."

It applies equally when the interrogation techniques were improper only because, in the particular circumstances of the case, the confession is unlikely to have been the product of a free and rational will. ... (A)s we now reaffirm, the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination. *Id.* 106 S.Ct. at 450–451 (citations omitted).

We see no error in the district court's handling of the review of petitioner's claim.[8]

We close by noting that we recognize the brutality of the crime involved in this case and the frustration that will undoubtedly arise from some circles over the result we have reached. However, our society has chosen to protect individual liberties and, to do so, to err on the safe side in the manner in which state law enforcement officials can arrest and interrogate private citizens about unsolved crimes. Undoubtedly, there are more efficient and effective ways in which to battle crime, as can be evidenced by a survey of the criminal justice systems of other countries in this world. However, we have no doubt about the wisdom of this country's priorities, and examples, such as the instant case, must from time to time be set in order to uphold principles we believe the citizens of this country still deeply cherish.

The ruling of the district court is hereby AFFIRMED.

**8.** We find no need to rule on the state's burden of proof argument which focuses on the issue of whether petitioner bears the burden of proving his confession involuntary or whether the state must prove a valid waiver in a habeas corpus action. We find any discussion of this issue in this case unnecessary because under either standard advanced by the state we believe affirmance of the district court ruling is in order.