Norman J. JOHNSON, Petitioner,

v.

Clarence TRIGG, Superintendent,
Respondent.

No. IP 91–143–C.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 15, 1993.

Norman J. Johnson, pro se.

Thomas D. Quigley, Indianapolis, IN, for respondent.

### MEMORANDUM

BARKER, District Judge.

This cause comes before the Court on Petitioner's Petition for Writ of Habeas Corpus, Respondent's Return to Order to Show Cause and accompanying Memorandum, Petitioner's Traverse, and Respondent's Reply to Traverse. Respondent has provided the Court with the transcript of state court proceedings. Having considered the foregoing, and being duly advised, the Court now finds that an evidentiary hearing is not required and that the Petition for Writ of Habeas Corpus must be GRANTED. Fed.R. § 2254 Cases 8.

## BACKGROUND

The undisputed facts are as follows. On October 31, 1981, Petitioner Norman J. Johnson was involved in a series of incidents far more serious than the typical pranks in which a 14–year old might engage on Halloween. He was a participant in two armed robberies. The first occurred about 8:30 p.m. Petitioner and Sean McKay kicked in the back door of Seamon's Grocery Store and robbed the owners at gunpoint. Roughly two and one-half hours later, Petitioner and Sean McKay robbed the Zephyr Gas Station. The station attendant was shot in the abdomen by one of the boys.

On November 2, 1981, Sean McKay gave a statement to the police. He named Petitioner as his accomplice and the gunman in the Zephyr robbery. A warrant for Petitioner's arrest issued November 3, 1981.

On the same day, a warrant for the arrest of Petitioner's mother was issued under the following circumstances:

Sometime in May of 1981, Petitioner was believed to have committed a juvenile offense. Prior to the filing of a delinquency petition in juvenile court, a juvenile probation officer meets with the juvenile and his parents to undertake what is called a pre-petition inquiry. A pre-petition inquiry is a prerequisite to the filing of a petition against the juvenile. Mr. Bernard Burns was the juvenile probation officer assigned to conduct Petitioner's pre-petition inquiry. Sometime prior to May 21, 1981, Mr. Burns saw Petitioner's mother in the parking lot of a local junior high school. Mr. Burns mentioned the need for a meeting with her and Petitioner. Petitioner's mother informed Mr. Burns that she could not bring her son in because he did not live at home and she did not know how to locate him. Mr. Burns told her to bring him in "at her earliest convenience" and "as soon as she could." (R. at 399). Mr. Burns did not give her any deadline or time frame within which to comply. (Testimony of B. Burns at R. 392–400.)

On November 3, 1981, the police were looking for Petitioner as a suspect in the Zephyr Gas Station robbery. The police went before the juvenile court referee seeking a warrant for Petitioner's arrest. Mr. Burns was present and related to the Court his previous discussion with Petitioner's mother. A bench warrant for contempt of court was issued for Petitioner's mother. A warrant was also issued for Petitioner's arrest. (R. at 395–96, 399).

At no time between May, 1981, and November 3, 1981, was Petitioner within his mother's physical control such that she could have brought him in to meet with Mr. Burns. (R. at 373–77).

At about 9:00 p.m. on November 3, 1981, Petitioner came to the police station with his uncle because he had heard the police were looking for him. He was arrested. The uncle left the police station and went to pick up Petitioner's mother. Petitioner's mother went to the police station with the understanding that the police had requested for her to come down to the station and be present so that Petitioner could be questioned. When Petitioner's mother arrived, she was arrested in front of Petitioner by Officer Scott Seliger. (R. at 177). She began crying, and she asked Officer Seliger if she could be released on her own recognizance or have a bond set because she was sick. (R. at 180, 329). Petitioner's mother had just been in the hospital for two weeks, where she had undergone major surgery. She had been diagnosed with cancer and had been given six months to a year to live. (R. at 329–30). Officer Seliger responded that it was too late at night and that she was going to spend the night in jail. (R. at 175–76). She did not sleep at all that night at the jail.

The next morning, just after eight o'clock on November 4, Petitioner and his mother were brought back to the police station. They were given about 15 to 20 minutes alone to talk. Both Petitioner and his mother cried during their talk. Petitioner's mother told Petitioner she did not want to go back to jail. Detective Kevin Mays then came in the room to take a statement from Petitioner regarding the Zephyr robbery. Petitioner waived his Miranda rights. Detective Mays and Petitioner talked informally for several minutes so that Detective Mays could get a handle on the situation and would know what questions to ask during the formal statement.

A police department typist was then procured to take the statement. A statement was taken in which Petitioner implicated himself in the robbery of the Zephyr Gas Station and in the shooting of the attendant. (R. at 140–42).

As the last question of the statement, Detective Mays asked Petitioner if he had been threatened or promised anything in exchange for giving the statement. Petitioner answered "yes." Petitioner's mother also said "yes." Detective Mays immediately stopped the statement and asked "what is going on here?" (R. at 201, 309). Petitioner responded that the other policeman had promised them that if he gave a statement his mother would be released from jail. (R. at 201). Detective Mays brought Officer Seliger into the room. A phone call was made by Officer Seliger to the juvenile center regarding Petitioner's mother's release. Following the call, and further discussion, the question was asked a second time and this time Petitioner answered "no." Only the answer "no" was typed on the statement. Petitioner then signed it. (R. at 142–45, 151).

A statement regarding the Seamon's robbery was then taken from Petitioner later in the morning. After giving the second statement, Petitioner's mother was taken home by Officer Seliger and Detective Mays. (R. at 102, 309). An order releasing her from custody was signed by the juvenile court referee later that day. The order noted that Petitioner had given a statement to police. (See copy attached). Nothing further ever came of the contempt of court charge for which Petitioner's mother was jailed. (R. at 340).

Petitioner was waived into adult court by order of the Vigo County Juvenile Court. Petitioner filed a motion to suppress his Zephyr robbery statement in the Zephyr robbery case. Though the trial court noted that it was "tight" and "pretty tough," (R. at 213–14) the judge decided to "let the jury decide whether or not there was coercion (sic)." Although he "wouldn't [have been] the least bit surprised [if] they'd overrule me," (R. at 219) he denied the motion to suppress.

Petitioner objected at trial to the admission of the statement. On this occasion the trial judge stated a different reason, overruling the objection based on his "assumption ... that if [Petitioner] turned himself in, he was turning himself in to give a statement or plead guilty or whatever, and the coercion argument is raised after the fact." (R. at 325). The statement came in, Petitioner was convicted, and the trial judge sentenced him to 38 years.

Petitioner appealed directly to the Indiana Supreme Court. The only issue presented was the voluntariness of Petitioner's statement. The judgment of the trial court was unanimously affirmed. Petitioner now asks this Court for a Writ of Habeas Corpus. Petitioner challenges only the voluntariness of his statement.

*DISCUSSION*

A federal habeas corpus court is obligated to give *de novo* consideration to the issue of whether a Petitioner's confession was voluntary. *Miller v. Fenton,* 474 U.S. 104, 110–112, 106 S.Ct. 445, 449–451, 88 L.Ed.2d 405 (1985). The state court's conclusion may be given weight in the habeas court's determination, but it is clear that an independent decision based on a "study of the entire record" must be made. *Id.* at 111–12, 106 S.Ct. at 450–451. Properly derived state court factual findings must, however, be absolutely respected. 28 U.S.C.A. § 2254(d) (West 1977). Where no express findings of fact are made by the state courts, § 2254(d) does not come into play. *Cooper v. Scroggy,* 845 F.2d 1385, 1392 (6th Cir.1988). The habeas court is not to presume that certain facts were found simply because the state courts concluded that the confession was voluntary. *United States ex rel. Cole v. Lane,* 793 F.2d 155, 157 (7th Cir.1986). No findings of fact were made by the state trial court. The Supreme Court's exposition of the facts is a reconstruction derived from the record by reasoning back from the trial court's conclusion of voluntariness. *Johnson v. State,* 513 N.E.2d 650, 652 (Ind.1987). This is, of course, the very process questioned by our Court of appeals in *United States ex rel. Cole v. Lane, supra.* This Court will therefore consider all undisputed facts contained in the record in determining if Petitioner's confession was given voluntari-

ly. *Malinski v. New York,* 324 U.S. 401, 404, 65 S.Ct. 781, 783, 89 L.Ed. 1029 (1945).

■ The Court is to make its determination upon an examination of the "totality of circumstances" surrounding the giving of the confession. *Woods v. Clusen,* 794 F.2d 293, 297 (7th Cir.1986). And "the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether defendant's will was in fact overborne." *Miller,* 474 U.S. at 116, 106 S.Ct. at 452 (emphasis in original). A review of the totality of circumstances in this case reveals that the police's conduct is highly suspect and that Petitioner's confession was not voluntary.

■ Petitioner was 14 years old at the time the confession at issue was obtained. This is a critical factor in the Court's analysis. Special care must be taken in obtaining a confession from a juvenile. *See In re Gault,* 387 U.S. 1, 55, 87 S.Ct. 1428, 1458, 18 L.Ed.2d 527 (1967). And special care must be taken in examining the record to assure that a juvenile's confession was voluntary. *Id.; Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 303, 92 L.Ed. 224 (1948). In essence, although the standard for voluntariness is the same for juveniles as for adults, it is clear that a juvenile's will can be more easily transgressed.

Petitioner had not attained the educational level of a typical 14 year-old. He had only completed sixth grade. R. at 74. He was found to have an I.Q. of 85, which is in the low average range of intellectual ability. R. at 74. These factors compounded Petitioner's vulnerability.

It is disputed as to whether a promise was actually made by Officer Seliger to Petitioner regarding his mother's release from jail. Petitioner says that a definite promise was made: if he gave a statement confessing his guilt, his mother would be released from jail. Respondent contends that Officer Seliger said only that he would do what he could to

have Petitioner's mother released if he cooperated, but that it was not his decision.[1]

The only reasonable inference available from the undisputed facts surrounding Petitioner's mother's arrest and release is that she "was being held hostage to pressure [Petitioner] into cooperation." *United States v. Scarpelli,* 713 F.Supp. 1144, 1155–1156 (N.D.Ill.1989). Five months had gone by until, coincidentally (we are to believe), a warrant for Petitioner's mother is issued on the same day and at the same time Petitioner's warrant was issued. Petitioner's mother was arrested in front of Petitioner. R. at 177. Officer Seliger decided that it was too late to see about having her released that night; he "had to take her to jail." R. at 176. As soon as Petitioner cooperated the next morning, his mother was released. R. at 102, 340. The order releasing Petitioner's mother stated no other basis for its issuance but Petitioner's cooperation in giving a statement. (See copy attached). And absolutely nothing ever happened with regard to the contempt charge on which Petitioner's mother was arrested. R. at 340. It disappeared.

■ No matter what was actually said, it is apparent that Petitioner's mother's arrest was used by the police to manipulate Petitioner. That we do not know for a fact whether an actual promise was made is not even important. *Petitioner believed one had been made.* Respondent has not disputed this. The detective who took the statement testified that Petitioner must have believed a promise had been made. R. at 282. The typist who was typing the statement testified that Petitioner seemed to have believed a promise had been made. R. at 208–209. But the most telling evidence that Petitioner believed a promise had been made is that HE SAID SO. R. at 96, 143, and 201. His answer was spontaneous and concurrent with the statement, not an after-the-fact excuse for giving a harmful confession. Petitioner's perception of the situation controls in determining whether he gave the confession voluntarily. *Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968).

---

1. The Indiana Supreme Court noted this conflict but did not resolve it. It went on, however, to assume *arguendo* that a promise had been made. *Johnson,* 513 N.E.2d at 652.

Moreover, it must be understood that the subtlety of the distinction between the clauses "your mother will be released from jail if you cooperate" and "of course it's up to the judge, but I'll do what I can for her" was probably lost on the 14–year old Petitioner in an interrogation room with two police officers and a crying mother. As legally trained adults who have had the benefit of Contracts I and learned the wonders of the "illusory promise," the distinction is to us very real. Whether a 14–year old, of low average intelligence with a sixth grade education in the context of a police interrogation room would apprehend the same distinction is fairly open to question. It is to be expected that he would hear what he hoped to hear, but it is notable that what he said he heard is exactly what occurred. His mother was released on the basis of one telephone call from Officer Seliger without the necessity of a trip to Court. Further, her release was documented by a Court order that stated as its only justification that her son had cooperated.

Respondent presses a two-prong response. First, even if Petitioner believed a promise had been made, the promise did not induce him to confess. Second, although the confession may have been given by Petitioner under the impression that a promise had been made, it was subsequently rehabilitated.

Respondent argues that Petitioner did not really care for his mother, and so was not genuinely concerned whether she was released from jail or not. Therefore, seeking his mother's release was not the reason Petitioner confessed. The sole support for this argument comes from the fact that Petitioner had run away from home in May, 1981, had subsequently avoided his mother and did not visit his mother in the hospital. R. at 135–136. The argument ignores the fact that Petitioner was a 14 year-old child. The parent-child relationship is usually the closest relationship a child has in his early years. As a child becomes a teenager, he or she can become uncontrollable or rebellious. This does not mean all feelings for the parent are lost. Deeply rooted childhood feelings are especially likely to come to the forefront during times of crisis. Prior to the statement, Petitioner's mother had been crying and told Petitioner, as she had told the police the night before, that she did not want to go to jail. R. at 337. She was ill. R. at 337. Even had Petitioner previously despised his mother, he certainly could have felt compassion at seeing his mother in the state she was in; enough compassion to make his subsequent confession involuntary.

But Petitioner had a reason, other than dislike, to avoid his mother. She intended to turn him in to the authorities. R. at 136–137. It is not unlike a 14–year old to attempt to avoid unpleasant consequences, even if he must avoid someone for whom he cares. Petitioner's Pre–Sentence Investigation Report noted that a 1980 diagnostic evaluation prepared at the Indiana Boys' School observed: "Norman and his mother do have a great deal of mutual affection even though the mother is unable to effectively discipline this youth at this time." R. at 73.

Just as the fact that he said so was strong evidence that Petitioner believed a promise had been made, so also is it strong evidence that the belief induced the confession. Petitioner was concerned enough about the promise to, in response to the question, instantaneously remember it and to state that it was made. Petitioner gave no other reason why he desired to give a statement. No other reason is apparent from the record. Ordinarily, the presence of a parent at a child's custodial interrogation would benefit the child in that the parent could provide guidance and emotional support. But this cannot be said of Petitioner's situation. His mother was not at that time and place primarily concerned with Petitioner's interests. She wanted to get out of jail, and she informed Petitioner of this. Rather than helping Petitioner, his mother's presence created the leverage the police needed to obtain a confession.[2]

---

2. A distinction has been drawn between "promises of leniency in the imminent criminal proceedings against the defendant and promises of help with some collateral problem." *Miller v. Fenton,* 796 F.2d 598, 610 (3rd Cir.1986). A promise of help with a collateral problem was deemed less coercive than a promise of leniency in the criminal proceeding at hand. *Id.* This may be true with adults. But when the defendant is fourteen years old and the problem con-

Petitioner believed a promise had been made. He confessed to the Zephyr Gas Station robbery in the belief that his mother would be released from jail. Respondent labels this belief a "misunderstanding" on Petitioner's part, and in so doing acknowledges that Petitioner actually held the belief: "He finished and signed the statement only *after* Detective Seliger had eliminated any misunderstanding regarding his mother's incarceration." Respondent's Memorandum in Support of Return to Order to Show Cause, p. 11. It is Respondent's contention that the involuntary statement was ratified and made voluntary by Petitioner after it was explained to him that no promise had been made.[3]

This "rehabilitation," alleged to have been occasioned by Petitioner completing and signing the confession, is best analyzed as if two distinct statements had been made. In this analysis, Petitioner's confession prior to the rehabilitation is the first statement. Petitioner's signed confession after the rehabilitation is the second statement. The issue becomes: Was the second statement voluntary? The reason for this characterization of the issue is twofold. Most importantly, the analysis is logical and an appropriate manner in which to determine whether the involuntary statement was actually rehabilitated.

Secondly, there is an abundance of case law addressing second confessions.

■ A confession following an involuntary confession can be voluntary or involuntary. *See Oregon v. Elstad,* 470 U.S. 298, 310, 311–312, 105 S.Ct. 1285, 1294–1295, 84 L.Ed.2d 222 (1985). The subsequent confession might be found involuntary because: (1) the "coercion has carried over into the second confession," *Id.* at 310, 105 S.Ct. at 1293; or (2) the cat is out of the bag and the suspect feels he has nothing to lose in again confessing. *Id.* at 311.[4] The coerciveness of Petitioner's belief that a promise had been made is presumed here to have been eliminated when the police explained to him that no promise had been made. *See* note 3, *supra.* The relevant inquiry focuses on (2) above.

■ The Supreme Court in *Elstad* listed three factors to consider when determining whether coercion has carried over to the second confession: (1) time between confessions; (2) change in place of interrogation; and (3) change in identity of interrogators. 470 U.S. at 310, 105 S.Ct. at 1293. These factors are also helpful in evaluating whether the fact that a confession was previously made had a causal connection to the subsequent confession. Their application here hardly need be discussed. There was virtu-

---

cerns his mother being in jail, a promise regarding the "collateral" problem could easily be considered just as coercive. Similarly, the suggestion by the Indiana Supreme Court that a threat or promise regarding a spouse is of a higher order than a threat or promise made to a child about a parent is questionable to say the least. *Johnson,* 513 N.E.2d at 652.

3. This argument assumes that: (1) the police actually explained that a promise had not been made; and (2) Petitioner actually understood that a promise had not been made. Both facts are probably disputed by Petitioner, though from the record it is not clear. The Court here accepts them as true.

4. The following quote from *Elstad* shows the Supreme Court's belief that the "cat out of the bag" effect can make a subsequent confession involuntary: "But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." 470 U.S. at 311, 105 S.Ct. at 1294 (quoting

*United States v. Bayer,* 331 U.S. 532, 540–541, 67 S.Ct. 1394, 1398–1399, 91 L.Ed. 1654 (1947)) (emphasis added). The essence of the quote is that a subsequent confession can be voluntary despite a previous involuntary confession. But if the "cat out of the bag" effect could never render a subsequent confession inadmissible, the Court would simply have omitted the word "perpetually." Further support for the potential of such an effect to render a subsequent confession involuntary is that the Court in *Elstad,* while stating that the metaphor can be misleading when taken out of context, did not dismiss its potential accuracy in the proper context. *Elstad,* 470 U.S. at 303–304, 105 S.Ct. at 1289–1290. Finally, the metaphor is supported by common sense. A suspect who is unfamiliar with the courts and rules of evidence, especially a child, is unlikely to realize on his own that although the secret is out, for all practical purposes it is not. *See Darwin v. Connecticut,* 391 U.S. 346, 350, 88 S.Ct. 1488, 1490, 20 L.Ed.2d 630 (1968) (Harlan, J. concurring in part and dissenting in part); *Quartararo v. Mantello,* 715 F.Supp. 449, 462–463 (E.D.N.Y.1989), *aff'd without op.,* 888 F.2d 126 (2nd Cir.1989). Believing it out forever, the suspect has no incentive not to repeat the confession.

ally no time between confessions, no change of location, and no change in interrogators. Further, and most importantly, there was no advice of rights prior to the second confession as there was in *Elstad*.

The Court is of the opinion that at least a *Miranda* warning would have been required to dissipate the "cat's out" effect.[5] As it was, Petitioner had no way to know that he had any option other than to complete the statement. He had already confessed. Petitioner certainly did not know that because what he believed was a promise had been retracted, he could for all practical purposes successfully retract his statement as well.

When the supposed rehabilitation occurred, Petitioner, in ratifying the confession just given, was essentially giving a second statement. Although the second statement was proceeded by a warning that no promise had been made, it was not preceded by a *Miranda* warning. In *Quartararo v. Mantello*, 715 F.Supp. 449 (E.D.N.Y., 1989), *aff'd without op*, 888 F.2d 126 (2nd Cir.1989), *Miranda* warnings were given prior to second and third confessions. The court still found that the "cat's out" effect made both subsequent confessions involuntary:

> The District Attorney here has not only failed to meet his burden of proving that the second confession "was not itself the product of improper threats or promises or coercive conditions," he has also failed to establish that it was not "directly produced by the existence of the earlier confession." Indeed, the first and second confessions were essentially a single confession by an emotionally distraught teenager that was interrupted only by the belated effort of Detective Palumbo to comply with *Miranda*. Once having admitted his complicity in the assault on John Pius in the belief that nothing would happen to him, it is unlikely that he thought he had anything more to lose by continuing. *Darwin v. Connecticut*, 391 U.S. at 350–51, 88 S.Ct.

at 1490–91 (Harlan, J., concurring in part and dissenting in part).

. . . .

The same considerations that compel the conclusion that the second confession was involuntary apply equally to the third. Where, as here, petitioner was told to repeat his prior involuntary confession, it is simply impossible to say that the confession so elicited was "not directly produced by the existence of the earlier confession." Moreover, while the presence of the defendant's mother and the administration of the *Miranda* warnings might under some circumstances be sufficient to dissipate the effect of impermissible tactics used to elicit an earlier confession, more is required before a juvenile is asked to repeat a prior confession that has been induced by the tactics employed here. At the very least, petitioner should have been told that the prior promise of leniency was no longer valid and that, if he again confessed, he would be prosecuted and the confession used to convict him. *United States ex rel. Stephen J.B. v. Shelly*, 430 F.2d 215, 218–19 (2d Cir.1970).

*Id.* at 463, 465. The Court finds this reasoning persuasive. Detective Mays should have advised Petitioner of his rights at the time he informed Petitioner that no promise had been made. He did not. That Petitioner answered the final question "no" and signed the confession did not rehabilitate it. The initial confession was given involuntarily. It remained involuntary because Petitioner was not sufficiently advised of his rights so that he could make a voluntary decision on whether to ratify it.

The Court's conclusion that Petitioner's confession was involuntary is contrary to that of the state trial court and the Indiana Supreme Court. The United States Supreme Court has stated that a federal habeas court can, and should, "give great weight to the considered conclusions of a coequal state ju-

---

5. The Court has very serious misgivings as to whether a simple *Miranda* warning, without more, would have been sufficient. *See Westover v. United States*, decided together with *Miranda v. Arizona*, 384 U.S. 436, 495–496, 86 S.Ct. 1602, 1638–1639, 16 L.Ed.2d 694 (1966) (*Miranda*-type warnings given after extensive questioning but just prior to confession not sufficient to enable a knowing and intelligent waiver of rights). As no warning at all was given, these concerns need not be resolved.

diciary." *Miller*, 474 U.S. at 112, 106 S.Ct. at 450. The state courts' conclusions in this case, however, cannot be deemed considered.

The state court trial judge dismissed Petitioner's coercion argument because he believed that, prior to the time when the alleged promise was even discussed, Petitioner was predisposed to confess. The argument is rational, but the inference used to support the argument is outrageous. The judge says that Petitioner was predisposed to confess BECAUSE HE TURNED HIMSELF IN! The judge actually states that Petitioner must have been turning himself in to: (A) "give a statement;" (B) "plead guilty;" or (C) do "whatever." R. at 325. Petitioner's objection at trial to the admission into evidence of the statement was denied on this reasoning. The judge announced his ruling at trial as follows:

> Dennis, I'll go back again to my presumption or assumption relative to that confession that the Defendant was turning himself in—either on his own volition or the assistance of whoever he came in with—at which time he didn't know his mother had been arrested, he didn't know she was in jail, and the Court has got to assume that if he turned himself in, he was turning himself in to give a statement or plead guilty or whatever, and the coercion argument is raised after the fact. It's raised after he's talked to his mother. And I think for that reason that argument has got to fail—which is—the basis of my original ruling and it will be the basis of ruling denying (sic) the motion for directed verdict here—it being raised only on the confession and not on the lack of other evidence if the confession is in. Okay? R. at 324–326.

This reasoning strips Petitioner of his right to be presumed innocent until proven guilty, and it does not even accord with common sense: an innocent person would be more likely to go to the police station to see why the police were looking for him than a guilty person.

The trial court's ruling on the admissibility of Petitioner's confession is so fundamentally flawed that it has not been accorded any weight in this Court's determination. Nor is the Indiana Supreme Court's affirmance of the trial court's determination worthy of being accorded any weight. That court apparently did not discover the basis of the trial court's ruling, because it was not mentioned in the court's opinion. *Johnson v. State*, 513 N.E.2d 650 (Ind.1987). In addition, the Indiana Supreme Court reviewed the trial court's finding deferentially. The court stated: "(A) trial court's finding of voluntariness of a confession will not be disturbed if supported by substantial, even though conflicting evidence." *Johnson*, 513 N.E.2d at 651. The Indiana Supreme Court did not make an independent determination, and its affirmance has been accorded no weight.

Finally, Respondent points out that harmless error analysis is now properly applied to instances of coerced confession. *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). The Court is not able to conclude on the facts of this case that the admission of Petitioner's confession was harmless error. The state's evidence apart from the Petitioner's confession consisted of the testimony of the robbery victim, who expressly avoided looking at the perpetrators for his own protection and could not identify either youth. The other witness was a friend of Petitioner who testified that Johnson and McKay came to her house the day after the robbery and Johnson stated that he "shot a man" at the Zephyr Gas Station the night before. She testified that Johnson placed an object in her ceiling tile later found to be a gun. The balance of the testimony concerned the confession. In the light of the gaps in the state's case without the confession, it is not possible for this Court to say the error was harmless beyond a reasonable doubt.

## CONCLUSION

Petitioner's confession was given involuntarily. It was not rehabilitated when Petitioner's "misunderstanding" was cleared up. The confession was unconstitutionally used to convict Petitioner. As a result, Petitioner is entitled to a new trial. Petitioner's Petition for a Writ of Habeas Corpus is hereby GRANTED. Unless Petitioner is given a new trial by the State of Indiana within

ninety (90) days of the issuance of this opinion, Petitioner is ordered released.

IT IS SO ORDERED.

## ATTACHMENT

## EXHIBIT B

State of Indiana

County of Vigo

IN THE 43rd JUDICIAL CIRCUIT COURT JUVENILE DIVISION

IN THE MATTER OF NORMAN J. JOHNSON

A CHILD ALLEGED TO BE A DELINQUENT CHILD

RE: ORDER OF RELEASE OF DEANNA JOHNSON

CAUSE NO. CJ- DETENTION HEARING ORDER

Comes now Terre Haute Police Department by Sgt. Ben Bush and informs the Court that minor child, Norman J. Johnson and his mother, Deanna Johnson have been arrested on Bench Warrants issued by this Court on the 3rd day of November, 1981. Sgt. Bush also advises the Court that minor child, Norman J. Johnson has made a statement in regards to the alleged Armed Robbery (Two Counts) that Bench Warrant was issued for on the minor child from this Court.

The Court being duly advised now recommends that Deanna Johnson, natural mother of minor child herein, be released from the Vigo County Jail on Warrant issued by this Court for failure to appear and be ORDERED to appear in the Vigo Circuit–Juvenile Division, R.R. # 51, Terre Haute, Indiana on the 5th day of November, 1981 at 8:30 A.M. for Detention Hearing to be held on the alleged charges on minor child.

Norman J. Johnson, minor child to remain in the Vigo County Juvenile Detention Center until further order of Court.

SUCH ARE THE RECOMMENDATIONS OF YOUR REFEREE.

/s/ Harry C. Dees, Jr.

Referee of the Juvenile Court

The Court having reviewed the findings and recommendations of the Referee of the Juvenile Court, Vigo County, Indiana, Harry C. Dees, Jr., hereby approves same.

/s/ [Signature]

JUDGE VIGO CIRCUIT COURT

SO ORDERED, this the 4th day of November, 1981.