**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Patricia R. SABLOTNY, Defendant–**
**Appellant.**

**No. 93–1094.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 15, 1993.

Decided April 11, 1994.

---

James E. Beckman, Office of U.S. Atty., Springfield, IL (argued), for U.S.

Michael B. Metnick, Peter Wise (argued), Metnick, Barewin, Wise & Cherry, Springfield, IL, for Patricia Sablotny.

Before CUDAHY, FLAUM, and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Patricia Sablotny was 62–years old when a jury found her guilty of arson and conspiring to burn the Argonne Tavern in Springfield, Illinois. 18 U.S.C. §§ 371 and 844(i). The court sentenced Ms. Sablotny to concurrent terms of 46 months' imprisonment on each count.[1] Ms. Sablotny appeals from the judgment of conviction asserting that the trial court wrongfully admitted her confession into evidence and sentenced her incorrectly. We affirm.

■ The district court conducted a suppression hearing and concluded that Ms. Sablotny's confession was voluntarily made and admissible as evidence of her guilt. Ms. Sablotny raises a somewhat novel argument before this court: she argues that her advanced age rendered her unusually susceptible to coercive treatment. Although only 62, she describes herself as an elderly woman, who was upset and scared at the time of questioning and, therefore, could not effectively resist the pressure of the police to confess. Based on the argument that hers was a single aberrant act, Ms. Sablotny also challenges the trial court's refusal to depart downward from the prescribed sentencing guidelines. See 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0 et seq. Cf. U.S.S.G. Ch. 1, Pt. A, Intro. ¶ (d) (single act of aberrant behavior may justify probation). But we do not have jurisdiction to review the district court's discretionary refusal to grant a downward departure from the Sentencing Guidelines.[2] United States v. Gulley, 992 F.2d 108 (7th Cir.1993).

Ms. Sablotny owned and operated the Argonne Tavern in Springfield, Illinois from 1975 to February 1992. On February 16, 1992 the Argonne Tavern was destroyed by fire. A friend notified Ms. Sablotny of the fire and Ms. Sablotny's son drove her to the tavern. During the course of the day, Detective Amos Mitchell of the Springfield Police Department arson investigation squad questioned Ms. Sablotny several times. First, Mitchell questioned Ms. Sablotny in her car in the presence of her two sons. She was cooperative in answering his questions about ownership of the building, about her lease of the bar premises and about the operation of the bar. Ms. Sablotny then left. A few hours later, Mitchell questioned Ms. Sablotny again, this time in the front seat of his police car. She supplied insurance information not available to her during the first meeting and admitted that she and Michael Yucas, who later confessed to committing the arson at Ms. Sablotny's request, had been at the tavern earlier that day. Ms. Sablotny gave Yucas' telephone number to Mitchell. Ms. Sablotny then departed. Yucas was called to the scene and questioned by Mitchell.

Yucas and Mitchell then proceeded to the police station where Yucas made a full confession. Yucas, who worked as a part-time bartender at the Argonne, is the son of Ms. Sablotny's longtime boyfriend. At 4:55 p.m., Yucas signed a waiver of his Miranda rights in the presence of Mitchell and his partner, Investigator Nevitt of the Springfield Fire Department. At 6:08 p.m., Yucas noted the time and signed his written statement. Mitchell and Nevitt then completed the required paperwork and waited for a squad car to take Yucas to the Sangamon County Jail. Nevitt testified that he and Mitchell then

1. The district court also ordered Ms. Sablotny to serve three years of supervised release following her incarceration and to pay restitution of $86,-841.

2. Our review of a sentence is limited to circumstances in which the sentence was (1) "imposed in violation of law," (2) "imposed as a result of an incorrect application of the sentencing guidelines," or (3) "outside the applicable guideline range and ... unreasonable." 18 U.S.C.

§ 3742(e), (f); United States v. Welch, 945 F.2d 1378, 1386–87 (7th Cir.1991), cert. denied, —— U.S. ——, 112 S.Ct. 1235, 117 L.Ed.2d 469 (1992). Here, the district court did not refuse a downward departure under a mistaken belief that it lacked authority to depart. Rather, the court concluded that this case did "not involve a single act of unplanned, spontaneous conduct by the defendant."

returned to the Argonne tavern between 6:00 p.m. and 7:00 p.m. At the tavern, Mitchell helped Ms. Sablotny remove the money from six game machines, divide it with the machine owners and leave by crossing the cluttered, burned tavern interior.

At the tavern, Mitchell did not tell Ms. Sablotny that he had spoken with Yucas. He asked her if she would come down to the police station so that he could take her statement. Ms. Sablotny acquiesced and asked if she could ride in her son's car. Mitchell agreed. Ms. Sablotny and her son Jerry met Mitchell and Nevitt at the police station. Because it was a Sunday, the outer doors to the police station were locked. Mitchell unlocked the doors, the foursome entered and Mitchell relocked the doors behind him. The four proceeded to Mitchell's office. All interior doors were open and unlocked. Mitchell testified that he then asked Jerry Sablotny if he would mind waiting in the lobby; Jerry agreed to this. Ms. Sablotny did not object. (Jerry testified that they arrived at the station between 7:15 and 7:30 p.m., and that he never entered the office but was instructed to wait in the lobby.) After Jerry left, Mitchell read Ms. Sablotny her constitutional rights. Ms. Sablotny signed a form waiving her *Miranda* rights at 7:35 p.m.

Mitchell testified that Ms. Sablotny was read her *Miranda* rights approximately three minutes after their arrival at the police station. In the suppression hearing, Ms. Sablotny testified that she arrived at the station between 6:30 and 7:00 p.m., that she was read her rights *after* being told of Yucas' confession, not before, and that Mitchell asked her frequent questions before giving her the *Miranda* warnings.[3] During the course of the interrogation, Ms. Sablotny was told of Yucas' confession implicating her. After this, Ms. Sablotny confessed to participation in the arson and was formally placed under arrest.

A confession is voluntary if, in light of the totality of the circumstances, the confession "was not secured through psychological or physical intimidation but rather was the product of a rational intellect and free will." *United States v. McGuire*, 957 F.2d 310, 315 (7th Cir.1992) (quoting *United States v. Haddon*, 927 F.2d 942, 945 (7th Cir.1991)). We have in earlier cases found certain factors relevant to determining voluntariness: the age of the defendant, her education, the nature of the questioning, the use of physical punishment, whether the defendant was read her rights, *United States v. Church*, 970 F.2d 401, 404 (7th Cir.1992) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1009, 122 L.Ed.2d 157 (1993), the duration of the questioning, *United States v. White*, 979 F.2d 539, 543 (7th Cir.1992), the defendant's prior experience with police, *Holland v. McGinnis*, 963 F.2d 1044, 1052 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993), and whether the defendant was under the influence of drugs or alcohol, *Haddon*, 927 F.2d at 946. Our previous consideration of age as a factor in voluntariness has, however, been limited to those defendants who are unusually susceptible due to their youth. *See, e.g., Woods v. Clusen*, 794 F.2d 293, 298 (7th Cir.1986) ("great care is necessary to insure the voluntariness of a confession when juveniles are involved"). *See also Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) (noting that minority "is a time and condition of life when a person may be most susceptible to influence and to psychological damage").

■ Turning to other factors in the analysis of voluntariness, our first step is to determine whether Ms. Sablotny knowingly waived her *Miranda* rights prior to confessing. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The district court found that, immediately upon her arrival at the station, Ms. Sablotny was read her *Miranda* rights and signed a waiver form. Underlying the district court's determination was its finding that Mitchell's version of the events, supported by the testimony of Nevitt and Jerry Sablotny, was more

---

**3.** Ms. Sablotny's "best estimate," that she went to the station about 6:30 or 7:00 p.m., is not contradicted by Jerry Sablotny's testimony that his mother and he arrived between 7:15 and 7:30 p.m. and the testimony that the *Miranda* form was signed at 7:35 p.m.

credible than the version advanced by Ms. Sablotny. Absent clear error, we will, of course, rely on the district court's credibility determinations. *United States v. Carter*, 910 F.2d 1524, 1529 (7th Cir.1990), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). The district court's factual findings, based on the testimony of Mitchell, Nevitt and Jerry Sablotny, are not internally inconsistent, and are thus not in clear error. *See Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses ... that finding, if not internally inconsistent, can virtually never be clear error.").

▆ The next step of our analysis is to determine whether a special standard of vulnerability is applicable to the elderly. In *Woods*, 794 F.2d at 297–98, we applied a standard, more sensitive than that applied to adults, in our determination of whether in the "totality of the circumstances" the confession of a sixteen and a half year-old was voluntary. There we held that the deceptive tactics employed, which we have held subsequently not to amount to coercion when applied to adults, defeated the voluntariness of the juvenile's confession. For example, the interrogators displayed graphic pictures of the murder scene, required the defendant to wear jailhouse clothes, falsely represented that the police had enough evidence to convict without a confession and misled the defendant with a fatherly manner and suggestions that things would "be better" or "go easier" if he confessed. *Woods*, 794 F.2d at 295. *Compare Holland*, 963 F.2d at 1051–52 (misrepresenting the strength of the evidence against an adult defendant is not inherently coercive); *United States v. Mizyed*, 927 F.2d 979, 982 (7th Cir.) (promise to make things easier on adult defendant if he confessed not invalidating), *cert. denied*, 500 U.S. 937, 111 S.Ct. 2065, 114 L.Ed.2d 470 (1991); *United States v. Harris*, 914 F.2d 927, 933 (7th Cir.1990) (police soliciting adult's confession by offering leniency not invalidating). Recognizing the importance of using "special care" with juveniles, we held that Woods' interrogators failed to exercise the care necessary to insure the voluntari-

ness of a confession by a juvenile. 794 F.2d at 298. *See Bobo v. Kolb*, 969 F.2d 391, 398 n. 7 (7th Cir.1992) (distinguishing circumstances of *Woods*, finding that police had not coerced adult defendant by continued questioning when defendant remained silent); *Sotelo v. Indiana State Prison*, 850 F.2d 1244, 1249 (7th Cir.1988) (permitting "fatherly" style interrogation to elicit confession of adult, citing *Woods*); *Barrera v. Young*, 794 F.2d 1264, 1270 (7th Cir.1986) (finding adult defendant's confession voluntary, where confession resulted from polygraph operator's appeal to defendant's religious convictions, citing *Woods*).

We have not previously invoked any special standard when dealing with elderly defendants. For instance, in *United States v. Hocking*, 860 F.2d 769 (7th Cir.1988), *partially overruled on other grounds, United States v. Levy*, 955 F.2d 1098, 1103–04 n. 5 (7th Cir.1992), the appellant argued that due to his age (62 years), heart condition and inexperience with the law, his will was overborne at the time he confessed. We found, however, that Hocking was "a mature adult ... with substantial work experience of a relatively sophisticated nature." Despite his claim to having chest pains during the interrogation and in spite of vigorous and persistent questioning by the FBI agents, Hocking's confession was voluntary. 860 F.2d at 774. Similarly, in *United States v. Oglesby*, 764 F.2d 1273 (7th Cir.1985), we found that while age was a factor to be considered, the appellant who "had three prior convictions for armed robbery, had earned some 200 hours of college credit, and was 54 years of age at the time of his confession," was not disadvantaged. 764 F.2d at 1278. In line with this precedent, we are not inclined here to give special consideration to the alleged vulnerability of a 62–year–old, on account of age alone.

▆ We have, however, applied a balancing test to claims of an impaired mental state from various causes. For example, "when the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into ques-

tion the voluntariness of the confession." *Haddon*, 927 F.2d at 946, (citing *Colorado v. Connelly*, 479 U.S. 157, 164–65, 107 S.Ct. 515, 520–21, 93 L.Ed.2d 473 (1986) (apart from improper·police coercion, mental condition of suspect is not dispositive of the issue of voluntariness)). In *Haddon*, the appellant claimed that he was under the influence of prescription drugs during the interrogation, and accordingly, was unusually susceptible to coercive tactics. ·We concluded that, "although, Mr. Haddon may have felt some coercion in his own mind, it is not at all apparent that a reasonable person in Mr. Haddon's position would have felt coerced. Nor would Mr. Haddon's claim that he was under the influence of the prescription drugs, without more, render his confession involuntary." 927 F.2d at 946. Ms. Sablotny's claim that, due to her age, she was unable to resist purported coercion is essentially a claim of mental impairment. Accordingly, we should apply the usual balancing test. The question is whether Mitchell and Nevitt should reasonably have known that Ms. Sablotny was unusually susceptible to psychological pressure. If mental impairment of whatever kind should have reasonably been apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary.

■ Ms. Sablotny testified that she *was not* under the influence of any drugs or alcohol during the interview. She testified several times that she *was* scared and confused. Mitchell, however, stated that Ms. Sablotny was very cooperative in answering questions and did not ask that an attorney or her son be present. In light of these circumstances, Mitchell and Nevitt were reasonable in assuming that Ms. Sablotny possessed normal mental competence. Thus, absent some incapacity that the interrogators could reasonably perceive, Ms. Sablotny's age, without more, does not render her confession involuntary.

■ Voluntariness of a confession is a question of law, subject to de novo review. *White*, 979 F.2d at 543. Mitchell and Nevitt appear to have acted politely and courteously towards Ms. Sablotny. They asked her to come to the police station and she acquiesced. They helped her open the game machines and assisted her in traversing the debris-ridden tavern floor. As noted, a helpful and sympathetic attitude on the part of the interrogator does not rise to the level of psychological manipulation. *See Sotelo*, 850 F.2d at 1249. Additionally, a defendant's decision to cooperate with police to allay suspicion suggests voluntariness if she confesses. *See White*, 979 F.2d at 543. Ms. Sablotny contends that Mitchell intended, by visibly locking the outer doors of the station, to confine her to the station and to frighten her. However, Ms. Sablotny does not assert that she tried to leave and was prevented from doing so. Her claim finds no support in the facts or in the law of this circuit. In *Schiro v. Clark*, 963 F.2d 962, 974–75 (7th Cir.1992), *aff'd on other grounds*, —— U.S. ——, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994), we held that the fact that the defendant was questioned in a halfway house, which he knew residents could not freely leave, did not render his confession involuntary. While the defendant in that case was not necessarily free to leave the institution, he *was* free to leave the interrogator's office at any time. *See also Williams v. Chrans*, 945 F.2d 926, 951 (7th Cir.1991) (questioning by probation officer, where the defendant called officer and came to probation office, did not defeat voluntariness), *cert. denied*, —— U.S. ——, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992).

■ Ms. Sablotny argues that Mitchell kept repeating questions and reiterating Yucas' accusations. She contends that this procedure was coercive. However, "an interrogating officer's act of merely informing the accused of the nature of the evidence implicating him, without more, does not constitute coercive police conduct." *Ray v. Duckworth*, 881 F.2d 512, 518 (7th Cir.1989) (citing *Woods* ). Ms. Sablotny testified that Mitchell told her that she would probably go to jail. She argues that this was coercive. But the police are allowed to play on a suspect's ignorance, fears and anxieties so long as they do not magnify these emotionally charged matters to the point where a rational decision becomes impossible. *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir.), *cert.*

*denied,* 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990). Under this standard, the police did not exceed their bounds by frightening Ms. Sablotny with the specter of jail, a prospect of which she must have been well aware in any event.

Next, Ms. Sablotny argues that she asked to see her son, but that Mitchell denied her that right by telling her falsely that he had left. She contends that this added to the burden of psychological intimidation. If Ms. Sablotny were a juvenile or impaired mentally, such a request would weigh heavily against a finding of voluntariness for her confession. However, an adult's request to confer with a friend or relative, if refused, does not render a confession involuntary. *See United States ex rel. Hughes v. McMann,* 405 F.2d 773, 776 (2d Cir.1968) (refusing to allow adult defendant to call sister did not render confession involuntary); *cf. Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (confession held involuntary where defendant was denied access to wife and family *until* he confessed). Ms. Sablotny also argues that her son requested to see her and was refused. But this is irrelevant. In *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court held that the failure of the police to notify an unsuspecting person under interrogation of an attorney's offer of representation did *not* deprive the suspect of his capacity to voluntarily waive his right to counsel. Similarly, the police's failure to notify an unknowing Ms. Sablotny of her son's request to speak with her does not affect the voluntariness of Ms. Sablotny's confession.

In the totality of the circumstances, there is no substantial support for Ms. Sablotny's allegation that the confession was the product of coercion. Therefore, the issue of harmless error does not arise. We can, however, note that, in addition to Ms. Sablotny's own confession, the evidence included Michael Yucas' confession, corroborated by the testimony of his father, Ken Yucas, who overheard Ms. Sablotny ask Michael Yucas to burn the tavern.

Therefore, the judgment of the district court is AFFIRMED.