Larry WATSON, Petitioner–Appellant,

v.

George E. DETELLA, Respondent–Appellee.

No. 96–2709.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1997.

Decided Aug. 22, 1997.

James S. Jacobs (argued), Office of the Cook County Public Defender, Chicago, IL, for Petitioner–Appellant.

Paul J. Chevlin (argued), Michael M. Glick, Office of the Attorney General, Chicago, IL, for Respondent–Appellee.

Before CUMMINGS, FLAUM, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

In 1988 a Cook County jury convicted Larry Watson of aggravated criminal sexual assault and attempted aggravated criminal sexual assault, and the trial judge sentenced him to a 17–year prison term. Watson appealed, arguing, among other things, that his confessions to the police and an assistant state's attorney had been coerced. The Illinois Appellate Court rejected Watson's coercion claim but found his first confession was tainted by inadequate *Miranda* warnings. However, the court affirmed Watson's convictions, reasoning the second confession was properly admitted and the failure to suppress the first was harmless error. Watson then filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254(d).[1] The district court found

---

1. Watson's petition was filed before the new ha-    beas provisions of the Antiterrorism and Effec-

the state trial court had failed to resolve key factual issues regarding Watson's coercion claim and referred the matter to a magistrate for an evidentiary hearing. After the parties stipulated to the facts, the magistrate recommended denying Watson's petition. The district court agreed and dismissed the petition. We now consider Watson's appeal.

The parties have stipulated to the following historical facts. T.B., a 16–year–old girl, testified that at 11:30 p.m. on December 19, 1986, she was walking to her Chicago home when she bumped into a friend. The friend was talking to Larry Watson. T.B. chatted with the pair and eventually went on her way. After a few minutes, Watson caught up with T.B. and asked if she would have sex with him for money. She declined. However, she agreed to give him her phone number and turned around so he could use her back as a writing surface. When T.B. turned back toward Watson, he pointed a gun at her abdomen and ordered her to accompany him behind a store. Once there, Watson forced T.B. to engage in oral and vaginal intercourse at gunpoint. He also attempted to anally rape her. After the assault T.B. went home and reported the incident to her mother, who called the police. Chicago Police Officers Alexander Curd and Robert McKeever arrived at 1:30 a.m., drove T.B. to the hospital, and set out to locate her assailant.

At approximately 3:45 a.m. the officers spotted Watson, determined he fit the description of the rapist, and approached him. Watson fled. At 4:15 a.m., after calling in additional officers to help in their search, Officers Curd and McKeever found Watson hiding in a mound of trash in the dark basement stairwell of a house belonging to one of Watson's friends. With their guns drawn and trained into the stairwell, the officers ordered Watson to come out with his hands up. Watson did not respond. Officer McKeever, his gun still drawn, then entered the stairwell and ordered Watson to raise his hands. When Watson again failed to comply, McKeever kicked at him, striking him in the head. Watson, who was bleeding from the kick, surrendered and was arrested. Shortly after the arrest the police found a gun in some nearby bushes.

Officers Curd and McKeever transported Watson first to the police station and then the hospital. Along the way, they read him some of his *Miranda* rights but failed to mention that he was entitled to the presence of appointed counsel, if he was indigent, during any police interrogation. Between 4:45 a.m. and 5:30 a.m., while awaiting medical treatment, Watson told McKeever he committed the rape. After receiving four stitches, Watson was returned to the police station, where he was left alone with McKeever for 15 minutes. At 7:30 a.m. Assistant State's Attorney Robert Bertucci arrived. After receiving complete *Miranda* warnings from both McKeever and Bertucci, Watson repeated his confession. Bertucci then told McKeever to leave the room and asked Watson if his statements were true and if he had been treated well by the police. Watson answered "yes" to both questions. Bertucci then left to prepare a written statement, which Watson signed at 8:30 a.m. Contrary to the allegations in his original habeas petition, Watson now concedes that McKeever never threatened him during the period between his confession at the hospital and his statement to Bertucci. Finally, during the 4 hours between his arrest and signed confession, Watson, then 17 years old and with just 8 months of high school under his belt, did not sleep, eat, or consult with his parents, guardian, or an attorney.

With that factual background in mind we turn to the procedural history underlying this appeal. Before trial Watson moved to suppress his statements, asserting he confessed only because he "was tired of being hit." He claimed his injuries were not the result of being kicked prior to his arrest but rather were incurred when Officer McKeever beat a confession out of him at the station house. The trial court held a hearing on the claim and found it to be without merit. After

tive Death Penalty Act of 1996 came into effect. Because the new provisions do not govern our review of Watson's claim, see *Lindh v. Murphy*, — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), all references to § 2254(d) will be to the version of the statute which existed prior to the effective date of the AEDPA.

a jury convicted Watson, he appealed. As we mentioned, the Illinois Appellate Court rejected his claim of physical coercion but concluded incomplete *Miranda* warnings rendered his first statement unwarned and inadmissible. The court went on to hold, however, that the second confession-which followed complete *Miranda* warnings—was properly admitted into evidence and any error in failing to suppress Watson's first statement was harmless.

After the Illinois Supreme Court denied review, Watson filed this habeas petition. He alleged the state appellate court failed to properly assess the "totality of the circumstances" surrounding his second confession and instead focused only on whether it was the product of intentional coercion. The district court not only agreed that the Illinois Appellate Court's analysis was incomplete but also found that the state trial court had failed to resolve "crucial factual disputes" over whether McKeever threatened Watson shortly before he confessed to Bertucci. As a result, the district court referred the case to a magistrate for an evidentiary hearing. Watson elected not to present live testimony and instead stipulated to the relevant facts. Importantly, he withdrew his assertion that McKeever threatened him. After briefing on the issue, the magistrate concluded Watson had the burden to show, by a preponderance of the evidence, that his second confession was not made voluntarily. The magistrate found he could not meet that burden and recommended that his petition be denied. The district court agreed, denied relief, and refused to issue a certificate of appealability. Watson filed a notice of appeal, which we construed as an application for a certificate of appealability and granted.

■ Before addressing the voluntariness of Watson's claim, we note the parties have devoted much time to haggling over whether the magistrate properly assigned the burden of proof at the evidentiary hearing. Both parties correctly point out that under 28 U.S.C. § 2254(d), unless certain enumerated exceptions apply, a state court's resolution of a factual issue is presumed correct, and a habeas petitioner can only rebut that presumption by convincing evidence.

The parties dispute, however, who has the burden of proof on such issues when one of the exceptions applies. We fail to see why the burden of proving the "factual issues" has any bearing on this appeal. Any factual disputes went by the boards when the parties agreed to stipulate to the relevant historical facts, and the voluntariness of a statement is not a "factual issue" but rather a question of law we review *de novo. Miller v. Fenton,* 474 U.S. 104, 115, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985); *United States v. D.F.,* 115 F.3d 413, 417–19 (7th Cir.1997).

■ So, was Watson's second confession voluntary? A confession is voluntary if the totality of the circumstances demonstrates that it was the product of rational intellect and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics calculated to overcome the defendant's free will. *United States v. Sablotny,* 21 F.3d 747, 750 (7th Cir.1994); *Holland v. McGinnis,* 963 F.2d 1044, 1050 (7th Cir. 1992). Among the factors relevant to this inquiry are the nature and duration of the questioning used to secure the confession, whether the defendant was prevented from eating or sleeping, and whether the defendant was under the influence of drugs or alcohol. *Sablotny,* 21 F.3d at 750. In addition, because a confession should not be the product of "youthful ignorance or the naivete born of inexperience," *United States v. Oglesby,* 764 F.2d 1273, 1278 (7th Cir.1985), we also consider the defendant's age, intelligence, education, and experience with the criminal justice system. *Holland,* 963 F.2d at 1052. Absent a showing of some type of official coercion, however, a defendant's personal characteristics alone are insufficient to render a confession involuntary. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 521, 93 L.Ed.2d 473 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.").

■ In assessing the totality of the circumstances we must also take into account the entire course of events leading up to the confession, including whether the defendant has made prior inculpatory statements. See

*Holland,* 963 F.2d at 1050–51. The Supreme Court's decision in *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), illustrates why this is so. In that case, police officers questioned Elstad, an 18–year–old burglary suspect, in his parent's living room. They did not give him *Miranda* warnings. When asked if he was involved in the burglary, *Elstad* replied, "Yes, I was there." After the officers took him to the station and read him his rights, he repeated his confession. Elstad later moved to suppress his second statement, reasoning he had no choice but to confess since his prior unwarned statement had already let the cat out of the bag. The case eventually reached the Supreme Court, which rejected Elstad's claim, holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318, 105 S.Ct. at 1297. The Court reasoned "absent deliberately coercive or improper tactics in obtaining the initial statement," the only question is whether the defendant made a rational and intelligent choice to waive his *Miranda* rights before making a subsequent statement. *Id.* at 314, 105 S.Ct. at 1295. The Court noted, however, had Elstad's first confession been secured through actual coercion, the proper inquiry would have been whether there had been a sufficient "break in the stream of events" to insulate the second confession from the earlier taint. *Id.* at 310, 105 S.Ct. at 1293.

■ Under *Elstad,* then, we must first determine whether Watson's first confession was triggered by official coercion. Prior to the evidentiary hearing below, Watson alleged that it was. In the state proceedings, for example, he claimed he was taken to the police station and beaten until he admitted raping T.B. In his habeas petition he abandoned that allegation but claimed McKeever threatened him just prior to his second confession. Watson now concedes he was neither beaten nor threatened by McKeever. As a result, the only possible "coercion" occurred when McKeever kicked Watson while making the arrest. That does not strike us as official coercion. Watson was not kicked during some sort of interrogation or in an effort to force him to confess. Rather, the stipulated facts make clear that Watson—who was hiding in a dark stairwell and was believed to have raped a young girl at *gunpoint*—was only kicked after he refused to raise his hands and show the officers that he no longer had a weapon. And even Watson apparently didn't think the kick amounted to official coercion. After all, he told Bertucci that he had not been mistreated by the police.

■ Because the record reveals no evidence of coercion, neither of Watson's statements can be considered involuntary, *Connelly,* 479 U.S. at 167, 107 S.Ct. at 521 and our only remaining inquiry is whether Watson voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to Bertucci interview. *See Elstad,* 470 U.S. at 318, 105 S.Ct. at 1297. Because, as we have just discussed, the record does not reveal any coercive police conduct, we fail to see how Watson's *Miranda* waiver was anything but voluntary. In addition, Watson admits he was given complete *Miranda* warnings before making his second confession and does not challenge his capacity to intelligently waive his rights. As a result, Watson's statement to Bertucci—like the second confession in *Elstad*-was properly admitted into evidence. It follows, then, that Watson is not entitled to a writ of habeas corpus.

■ However, even were we to conclude that Watson's arrest-related injuries amounted to evidence of official coercion, he would still not be entitled to relief. As we noted, where a defendant's prior confession was secured through threats or coercion, we must consider not only the petitioner's personal circumstances but also whether there has been a sufficient "break in the stream of events" which served to insulate the later statement from the tainted first confession. *Id.* at 310, 105 S.Ct. at 1293; *Holland,* 963 F.2d at 1050. When making that determination we look at the length of time between confessions, any change in the place of interrogation, and any change in the identity of the interrogators. *Id.* No single factor is determinative; rather, all three must be considered in the aggregate. *See e.g., United*

*States v. Marenghi,* 109 F.3d 28, 33–34 (1st Cir.1997); *Holland,* 963 F.2d at 1050–51; *Wilson v. O'Leary,* 895 F.2d 378, 384–85 (7th Cir.1990).

*Wilson* is a good example of the principle that no one factor is determinative. In that case, the defendant was convicted of deviate sexual assault for his part in a brutal rape. Prior to his arrest he had been led to a vacant lot by an off-duty deputy sheriff and surrounded by a group of the victim's friends as well as her enraged husband. *Id.* at 379. As the crowd "grilled" the suspect, the deputy sheriff handed one of the victim's friends a gun and left the scene. Fearing for his life, the defendant offered up the name of the "other guy" who was involved in the sexual assault. *Id.* A police officer then arrived on the scene and arrested the defendant. Immediately after reaching the station house the officer gave the defendant *Miranda* warnings and began to question him about the rape. Within 5 minutes the defendant again named his accomplice. *Id.* at 380. The defendant made a third incriminating statement to an assistant state's attorney later the same day. At trial, the prosecution agreed not to use the defendant's admissions from the vacant lot but sought to introduce his later statements. The defendant moved to suppress. The trial court denied the motion, finding the later statements merely recapped those made in the vacant lot, which he concluded were voluntary and, because of the private nature of the questioning, not covered by *Miranda. Id.* After the defendant exhausted his state appeals, he sought a writ of habeas corpus in federal court. A district judge issued the writ, finding: the defendant's first statement had been coerced; *Miranda* applied due to the presence of the deputy sheriff; and the admission of the "recapped" statements was not harmless error. Because the State did not argue harmless error on appeal, we affirmed. *Id.* at 384. However, we noted if the State retried the defendant his statements to the arresting officer would be admissible. We concluded although very little time passed between the coercive encounter in the vacant lot and the defendant's chat with the police, the "chain of events" had nonetheless been sufficiently broken as to insulate the later statements

from the earlier taint. *Id.* We reasoned the defendant "surely recognized the difference between [the police officer], who treated him 'by the book', and the crowd inflamed by the irate husband." *Id.* at 385.

■ In this case, Watson's written confession was sufficiently insulated from any coercion taking place at the time of his arrest. First, Watson signed his written confession over 4 hours after he was placed in custody and at least 2 hours after his first confession. And although Watson relies on a number of Fourth Amendment cases involving confessions obtained after a suspect was arrested without probable cause to argue that even a 6–hour break is insufficient, there is simply no bright-line test for determining the amount of time needed to adequately isolate a later statement from a prior coerced confession. *See Marenghi,* 109 F.3d 28 (break of approximately 2 hours sufficient where officer "coerced" confession by refusing to allow defendant to use the bathroom and threatening to call in a drug-sniffing dog); *Holland,* 963 F.2d 1044 (6 hours sufficient to insulate defendant's confession from the beating he suffered while in police custody); *Wilson,* 895 F.2d 378 (very little time needed to sever chain of events where nature and location of questioning and identity of interrogators changed greatly). Second, the alleged coercion in this case occurred at the scene of Watson's arrest. Neither of his confessions were given at that location. Rather, the first was made at the hospital, and the second was secured at the police station. Third, although Watson stresses that Officer McKeever was present when he gave both confessions, McKeever was not in the room when Bertucci asked Watson whether he had been treated "okay" by the police and if his confessions were in fact true. Watson answered "yes" to both questions. As a result, we believe the amount of time passing between the confessions, the change in location of the interrogations, and the fact that Bertucci talked to Watson outside of Officer McKeever's presence served to insulate Watson's second confession from any earlier taint.

■ Watson's personal characteristics also fail to convince us he was disadvantaged by "youthful ignorance or the naivete born of inexperience." *Oglesby*, 764 F.2d at 1278. Although Watson was 17 years old and had only attended high school for 8 months at the time of his arrest, we have rejected similar challenges brought by young defendants with even less education. *See e.g.*, *Weidner v. Thieret*, 932 F.2d 626, 627–28 (7th Cir.1991) (finding confession made by 17–year–old defendant with an eighth grade education and who claimed to have suffered brain damage due to frequent drug use was voluntary). There is also "no rule deeming teenagers, even slow ones, incapable of rational choice." *Johnson v. Trigg*, 28 F.3d 639, 642 (7th Cir. 1994) (reversing habeas relief granted to 14year-old defendant who claimed to have confessed only in an effort to secure his mother's release from jail—but remanding for an evidentiary hearing). In addition, this was not Watson's first foray into the criminal justice system. He had been arrested at least twice before—once for striking a Chicago Transit Authority bus driver and once for unlawful use of a weapon. Finally, although we note that Watson did not sleep or eat during the 4 hours he spent in police custody, there is no evidence that his free will was overcome by either exhaustion or hunger.

In sum, we find that a totality of the circumstances demonstrates that Watson's second confession was voluntary and properly admitted into evidence at the trial. It follows, then, that the district court's decision denying his petition for a writ of habeas corpus must be, and it is, AFFIRMED.