**UNITED STATES of America, Plaintiff,**

v.

**David K. DANSER, Defendant.**

**No. IP 98–161–CR–01TF.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 20, 1999.

David J. Colman, Attorney at Law, Bloomington, IN, for Defendant.

## ENTRY ON MOTION TO SUPPRESS

TINDER, District Judge.

This matter comes before the court on the Motion to Suppress Evidence ("Motion" or "Motion to Suppress") filed by Defendant David K. Danser. Mr. Danser moves for the suppression of any self-incriminating statements he made during two interviews with Detective Brad Swain ("Det.Swain") of the Monroe County (Indiana) Sheriff's Department. Mr. Danser also moves for the suppression of the contents of a lockbox found in Mr. Danser's business, contending that the lockbox was discovered as a result of Mr. Danser's statements in the second interview with Det. Swain.[1] Mr. Danser contends that his statements were involuntary, the product of the coercive conditions surrounding his arrest and confinement, as well as Det. Swain's coercive interview techniques. After consideration of the Motion and all the evidence and arguments submitted by the parties, the court finds as follows.

## I. Factual Findings [2]

The time spanned by Mr. Danser's contentions covers multiple days and numerous events. Therefore, the court will divide its factual findings and discussion into six categories: (1) the arrest; (2) the conditions of confinement; (3) the timing of the first and second interviews with Det.

Steven Debrota, Assistant U.S. Attorney, Indianapolis, IN, for Plaintiff.

1. At the suppression hearing, conducted on September 13–14, 1999, Mr. Danser's counsel stated that Mr. Danser is seeking the suppression of statements made during the two interviews with Det. Swain and the contents of the lockbox. The Motion, filed May 21, 1999, actually moves for the suppression of much more evidence. However, many of the contentions in that Motion were changed or withdrawn during the course of the suppression hearing. Therefore, the court relies chiefly upon Mr. Danser's contentions made at the hearing.

2. These findings are made using a preponderance of the evidence standard and mindful of the fact that the government bears the burden of proof. *See Colorado v. Connelly,* 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) (waiver of Miranda rights); *Nix v. Williams,* 467 U.S. 431, 444–45 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery of evidence obtained by unlawful means); *United States v. Matlock,* 415 U.S. 164, 177–78 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (voluntariness of consent to search); *Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of confession).

Swain;[3] (4) the first interview; (5) the events between the first and second interviews; and, (6) the second interview.

## A. The Arrest

At approximately 4:23 a.m. on May 20, 1998, local law enforcement officers forcibly entered Mr. Danser's motel room in Bloomington, Indiana. There is no dispute that they were acting pursuant to a valid search warrant or that the officers were justified in forcibly entering the room.[4] As the officers rammed the door (which was secured with a metal bar), Mr. Danser sprang from a bed, completely nude, and ran to the television set, where a handgun rested. As Mr. Danser struggled to open the zippered gun container, the officers burst in. Mr. Danser dropped the gun just as Officer Brian Oldham pushed him backward. Both Mr. Danser and Officer Oldham fell to the ground and Officer Oldham proceeded to handcuff Mr. Danser (with Mr. Danser's hands behind his back). Then Officer Oldham ordered Mr. Danser to stand and face the wall while other officers took a seven-year-old female ("Karen Doe"[5]) out of the room and began searching the room for other weapons.

At some point during this process, Officer Oldham pushed a gun against Mr. Danser's back and/or head. As a result, there may have been a red mark left on Mr. Danser's back and/or head. However, any injury or pain caused by the pushing was very minor,[6] even by Mr. Danser's testimony.

Within minutes after the officers' entry into the room, Officer Thomas Rudder began to escort Mr. Danser out of the room to a waiting patrol car. Mr. Danser, who was still nude, asked if he could put on his clothes. Officer Rudder refused Mr. Danser's request because Officer Rudder felt his clothes may constitute evidence in the case. However, Officer Rudder took an extra blanket off a bed and draped it over Mr. Danser's shoulders so that no part of his body would be exposed as they walked out to the patrol car. Two officers testified that as Mr. Danser was escorted the 5–7 steps to the waiting car, the blanket covered him at all times. Mr. Danser testified that at some point during the short walk, the blanket fell to the ground. But Mr. Danser also testified that the officers picked up the blanket, put him in the car, and then covered him up with the blanket, and generally handled the situation as efficiently as possible. The court finds that even if this brief moment of exposure of Mr. Danser's nude body occurred, the officers acted reasonably and any embarrassment or other injury to Mr. Danser, if any was suffered at all, was slight.[7]

---

3. There is no evidence that Mr. Danser was interviewed by any officer other than Det. Swain. Therefore, any future reference to "interview" or "interviews" will refer to one or both of the interviews between Mr. Danser and Det. Swain.

4. The officers had information that Mr. Danser was in the room with a seven-year-old female (whom he had molested on previous occasion(s)), was in the possession of two handguns, and was in an angry and suicidal state.

5. "Karen Doe" is a pseudonym; the court has sealed her actual name. In other proceedings in this action, "Karen Doe" has also been referred to as "Victim One."

6. Further, despite having numerous opportunities to tell the officers, the jailors, the jail's practical nurse, the jail's doctor, and Det.

Swain, Mr. Danser never mentioned any such injury. Indeed, when he was booked in the Bloomington jail less than an hour after the arrest, Mr. Danser told the booking officer that he was not injured. And on the day after his arrest, Mr. Danser told the jail's practical nurse that he had not "been injured recently" and did not "have an injury now." (Gov't Ex. 14 at 2.)

7. Mr. Danser's embarrassment at this brief moment of exposure (provided it occurred) would likely be less than most people would experience in such a situation. Mr. Danser testified that he has been a "devout nudist" for years, that he is "not ashamed of [his] body." Indeed, he had previously posed nude for an advertisement for a Bloomington nudist camp.

At 4:38 a.m., the police car containing Mr. Danser left the motel; it arrived at the jail at 4:46 a.m.

## B. The Conditions of Confinement

When Mr. Danser arrived at the Bloomington jail, an officer placed him in a holding area for approximately 13 minutes.[8] Then he was booked in the jail, a process that took about 10–15 minutes. During that period, Mr. Danser was still wrapped in the blanket. Once booking was finished, Mr. Danser was issued jail clothing and given a private area to dress. Then, at 5:15 a.m., he was placed in a holding cell designed for intoxicated persons. The cell contained videocameras which allowed the jail personnel to continuously monitor Mr. Danser (who had been placed on a suicide watch because the police had what appeared to be a suicide note written by Mr. Danser).

At about 2:20 p.m. on May 20, 1999, Mr. Danser was given a shower, two sets of new clothes, blankets, toilet paper, toothbrush and toothpaste and was taken to a segregation cell. The cell had a bed, a sink, and a toilet. Mr. Danser testified that he received the supper meal on May 20th, and the breakfast and lunch meals on May 21st before he was interviewed by Det. Swain. He testified that he did not eat the food because of anxiety, but the jailors "did everything they could to give [him] food."

Mr. Danser testified that he was prevented from sleeping at the jail before his interviews with Det. Swain.[9] He cites three main reasons: the lights remained on at all times in his cell; he did not have sleeping pills; and an officer at the jail periodically kicked his door. A jailer explained that because Mr. Danser was still on a suicide watch, the lights remained on at all times so that his activities could be monitored at all times in case he should try to harm himself. This explanation is convincing considering it is undisputed that the police had good cause to consider Mr. Danser a suicide risk. Also, there is no evidence that Mr. Danser asked any jailer for the lights to be dimmed or turned off. As for the medication, there is no evidence that Mr. Danser ever apprised any of his jailers of his need or desire for the medication. He had numerous opportunities to talk to different jail personnel, including a practical nurse on May 21, and there is no evidence that Mr. Danser ever requested sleeping medication at any time before the first or second interviews with Det. Swain. Finally, Mr. Danser did not identify who the officer was who allegedly kicked his door periodically. It is questionable that a single officer could prevent an inmate from sleeping, given that the officer must have gone off duty at some time. Further, there is no evidence that Mr. Danser ever told any other jailer about the kicking.

Mr. Danser received a copy of the jail's "Inmate Handbook," which details the grievance procedure for inmates alleging, among other things, "staff neglect, abuse or misconduct." (Gov't Ex. 10 at 4.) It provides that grievances are kept confidential and also indicates there is an appeals procedure. (*Id.*) There is no evidence Mr. Danser ever attempted to initiate a grievance about an officer kicking his door, or any other complaint.[10] Further, as is evi-

---

8. According to jail records, Mr. Danser arrived at 4:46 a.m. and a jail officer began booking him at 4:59 a.m.

Mr. Danser emphasized that this holding area had windows where jail personnel could look at him. However, he was wrapped in the blanket at the time and spent no more than 13 minutes there.

9. It is worth noting, however, that Mr. Danser also testified that when he arrived in the segregation cell at 2:20 p.m. on May 20, he did not immediately sleep "because [he] had already caught up on [his] sleep."

10. Mr. Danser testified that he could not read the Handbook because he did not have his glasses at the time. This testimony (that he could not read without his glasses) is not credible in light of the videotape of the second interview with Detective Swain, wherein Mr. Danser obviously reads (rather quickly) a doc-

dent in the videotaped interviews, Mr. Danser showed no hesitation in making complaints about jail conditions. He complained in the second interview that the jailers would not give him a pen or a hairbrush or underwear. He further complained that he wanted his own toothpaste and toothbrush because he did not like the toothpaste and toothbrush that the jail had given him.

Finally, the court finds that to the extent Mr. Danser suffered any sleep deprivation while in jail, it had very little effect on him during the interviews with Det. Swain. As discussed more fully below, it is apparent from Mr. Danser's demeanor in the videotapes that he was alert and responsive during both interviews.

Mr. Danser also testified that he asked to make phone calls on three or four occasions from the time he was taken to the jail to the time of the second interview with Det. Swain, but the jailors refused to allow him to make a call on each occasion. He also testified that he did not speak to an attorney until two, three or four days after his initial court appearance on May 22. He testified that it was "not possible" that he met with his first attorney, Roy Graham, before the second interview with Det. Swain. For the reasons stated below, the court finds that on all these points, Mr. Danser's testimony is not credible.

First, two jail employees, Captain Todd Powell and Officer Richard Stacy, testified that it was jail policy to allow inmates to make phone calls when the inmates ask for them. Neither witness remembered if Mr. Danser asked to make any calls, but each testified that had he asked, they would have allowed him to make the call. Based upon the demeanor of these witnesses, and the fact that they, and the other jailers,

had no reason to treat Mr. Danser any differently than any other inmate, the court finds their testimony more credible than that of Mr. Danser.

Also, Mr. Danser never attempted to file a grievance over the phone call issue or complain to anyone about it. He came into contact with numerous jail officers, Det. Swain, a practical nurse, a judge, and even his own attorney between the time of his arrest and the second interview on May 22. In light of Mr. Danser's complaints during his second interview with Det. Swain about such (relative) trivialities as the poor quality of his toothbrush and toothpaste, it seems very likely Mr. Danser would have raised the issue of being denied phone calls if the allegation were true.

Further, in the second interview, Mr. Danser told Det. Swain that "I want the titles to everything that is titled to me given to my attorney." (Gov't Ex. 2B at [2].[11]) Det. Swain responded, "[H]ave your attorney get in touch with me, I'll get in [touch] with the Prosecutor's Office." (*Id.*) Mr. Danser replied, "Okay." (*Id.*) Surely if Mr. Swain had not yet been permitted to telephone an attorney, he would not have phrased his request in such a way, or would have raised the issue after Det. Swain's response. He certainly would not have simply replied, "Okay."

Finally, the documentary evidence directly refutes Mr. Danser's assertions. The jail log for May 21 indicates that Mr. Danser left his cell at 11:05 p.m. for a shower and a telephone call. (Gov't Ex. 12, at 3.) The jail log for May 22 indicates that at 11:02 a.m., Mr. Danser left his cell for one hour and eighteen minutes to meet with his attorney. (Gov't Ex. 13 at 3.) The May 22 log then indicates that Mr. Danser

ument without his glasses and comments upon the information he read. While it may have been more difficult for Mr. Danser to read without his glasses (he makes a comment to that effect in the second interview), he was quite capable of reading nonetheless. Furthermore, there is no evidence that Mr. Danser ever told the jailer who gave him the

Handbook (or any other jailer) that he needed his glasses or that he needed the Handbook to be read to him.

11. Government Exhibit 2B, the transcript of the second interview, has no page numbers written on the transcript pages.

went to the courtroom at 1:25 p.m. and returned at 1:52 p.m. (*Id.*) Also, the Government produced a receipt from the jail, signed by Mr. Danser, indicating that on May 22, "Roy Graham, attorney," took possession of Mr. Danser's MasterCard and "PINN # ." (Gov't Ex. 11.) As more fully discussed below, the second interview with Det. Swain occurred in the late afternoon of May 22—after the documentary evidence shows that Mr. Danser made at least one phone call, met with his attorney for over an hour, provided his attorney with his credit card (perhaps as payment), and appeared before a judge. The court finds this documentary evidence, as introduced by Captain Powell, to be persuasive when contrasted with Mr. Danser's less-than-credible testimony that he was denied all requests to make phone calls and did not speak to an attorney until after the second interview.

## C. The Timing of the First and Second Interviews

Mr. Danser's counsel argued at the suppression hearing that the court cannot "say with certainty" when exactly Mr. Danser was questioned by Det. Swain. Counsel raised the possibility that the first interview could have been May 20 and the second on May 21, or perhaps in some other sequence. Interestingly, this appears to be a concern for no one but Mr. Danser's counsel: *both* Det. Swain *and* Mr. Danser testified unequivocally that the first interview occurred in the afternoon of May 21, and the second interview occurred in the afternoon of May 22.

The source of Mr. Danser's counsel's argument that the interviews could have been on different dates appears to be the fact that Det. Swain (or someone acting on information supplied by him) labeled the videotape of the two interviews as having occurred on "5–20–98" and "5–21–98." Also the transcript of the second interview is labeled "May 21, 1998." However, Det. Swain explained that upon reflection, he realized he was previously mistaken about the dates. His explanation of his reasons for realizing the error is convincing. His Probable Cause Affidavit against Mr. Danser was signed by him on the morning of May 21 and contains no mention of an interview with Mr. Danser or the new information he learned in the first interview with Mr. Danser. Therefore, it seems likely that the first interview was on May 21 (after he signed the Affidavit) rather than May 20. And it is apparent from the videotapes that Det. Swain was wearing a different outfit in the second interview than what he was wearing in the first. Therefore, it appears the second interview was on May 22 rather than May 21. This conclusion is further supported by a property report which indicates that on May 22, Det. Swain went to Mr. Danser's place of business and found the lockbox Mr. Danser described in the second interview. (Def. Ex. B at 8.) Mr. Danser's counsel insinuates that there is some nefarious reason for Det. Swain's change of position about the dates of the interviews, but Mr. Danser's counsel seems incapable of articulating what exactly that reason might be, let alone producing any evidence demonstrating its existence. And as mentioned above, Mr. Danser testified specifically that the "the second conversation [with Det. Swain] happened sometime in the afternoon of May 22nd ... about 24 hours after the first conversation on May 21st." Therefore, while Mr. Danser's counsel is correct that the court cannot say with *certainty* when Mr. Danser was questioned by Det. Swain, the court can say without hesitation that a preponderance of the evidence indicates that the first interview occurred in the afternoon of May 21, and the second interview occurred in the afternoon of May 22.

## D. The First Interview

The first interview between Mr. Danser and Det. Swain was recorded onto videotape, *see* Gov't Ex. 2, and was transcribed, *see* Gov't Ex. 2A. The contents of these Exhibits speak for themselves and need

not be repeated here, with the exception of three specific excerpts that relate directly to Mr. Danser's challenges.[12] The first excerpt is a narrative by Det. Swain made early in the interview, just after he advised Mr. Danser of his rights and Mr. Danser said he would "[s]ee where it [the questioning] goes" and acknowledged that he knew he could stop the questioning:

> I have to tell you that I've done this a long time. I'm very familiar with the entire situation that's been presented to me, okay? Ah, you're in a position to help yourself now, ... that's kind of where you're at right now is, ... it's no surprise to you that you're gonna have to answer to some things, my viewpoint is that I'm at a point where I ... have no reason to not proceed the course I'm on and, ... how I feel this case should be carried out, okay? I have ... no reason at this point to budge on my position in regard to your prosecution, ah, you're in a position to where I think your willingness to cooperate and talk about your problem that you have, I think can, in the long run, be beneficial to you, ah, that's my viewpoint, ah, I can tell you that I've had a lot of training and experience ... dealing with people with your condition and you aren't going to fool me.... [Y]our fast talking won't work, all you can do, my viewpoint is, is the best thing you can do is be totally up-front about everything.

(Gov't Ex. 2A at 2–3.)

Later in the interview, Det. Swain said, "[W]e don't want [Karen Doe] to be [hurt][13] by you." Mr. Danser responds, "Oh, no." And Det. Swain continues, "...

saying she's a liar or anything." (*Id.* at 11.) At the suppression hearing, Mr. Danser testified that he understood this comment (and others made by Det. Swain[14]) to mean that by confessing, Mr. Danser could save Karen Doe from suffering the traumatic experience of testifying about the alleged molestation in court and "hav[ing Mr. Danser] contradict[ ] her claim [he] molested her."

Finally, after Mr. Danser described a "sexual encounter" between he and Karen Doe in a hotel in Wilmington, North Carolina, Det. Swain asked, "[D]o you know what hotel you stayed at in Wilmington?" The following exchange then ensued:

> Danser: No, why do you wanna know?
>
> Swain: Ah, just curious, it has to do with corroboration.
>
> Danser: You're not gonna get charges goin' on down there, are you?
>
> Swain: They, I really doubt they'd be interested, you know, if she lived there or something, they might be, but I doubt they'd be interested, but I try to be as thorough as possible.
>
> Danser: Gosh, now you're scarin' me.
>
> Swain: Yeah, well, ... I doubt that they'd be interested, ... I've had situations like this where it's been at the next county and I have contacted them since it is the next county and they said, well, it's all being taken care of over there so they kind of like ...
>
> Danser: No.
>
> Swain: ... it's just ... spendin' money and all that, when it's all said and done, nothin's done, ... I mean, there's really no, you have to look at everything

---

12. For example, Mr. Danser does not challenge the sufficiency of the advice of rights (or *Miranda* warning) Det. Swain administered to Mr. Danser before the questioning began. Therefore, the court will not dwell on the issue.

13. The transcript has the word "her" written at this point, but upon viewing the videotape, the court is of the opinion that the word that was actually spoken was "hurt."

14. Mr. Danser testified that before the videotaped interview began, he and Det. Swain spoke briefly in the hallway. He testified that Det. Swain told him that "[he] could help [himself] and [he] could keep [Karen Doe] from further harm." These statements, if they were made, merely restate the substance of what Det. Swain says on camera in the above-quoted excerpts. Therefore, a determination of whether they were made is not necessary.

as a cost benefit, just like you do [in] business, I mean, that's what you, they do to, and they say there's no benefit in the cost.

Danser: Well, I'm gonna already be payin' dearly.

(*Id.* at 18.) Det. Swain then changed the subject of the conversation to another topic.

The final relevant factual issue related to the first interview is Mr. Danser's general demeanor during the interview. Throughout the course of the interview, Mr. Danser appeared alert, clear-witted, attentive and communicative. He appeared responsive to the changes in the tone and subjects of the conversation and fully aware of his situation. He did not appear particularly nervous or intimidated by Det. Swain. And he apparently felt confident enough to change and direct the subject of the conversation on multiple occasions. While he testified that he had only a ninth or tenth grade education and had never been interviewed by the police before, he also testified that he had a high I.Q. and had been a general contractor and had managed a video store. He also testified that he had been previously arrested on a child molestation charge in 1972 or 1973. He spent seven or eight days in jail (without being interviewed) before the charges were dropped. The net result of all of this information is that at the time of the interviews in this case, Mr. Danser appeared to be a fairly bright, alert individual. While he did not have a great deal of experience in the criminal justice system (although seven or eight days in jail is probably more experience in the system than most people have), he testified that he "had a long time to adjust to the idea that some day [he] might be called to account for [his] conduct in molesting children," and "it was no great surprise to [him] when it finally happened."

## E. The Events Between the First and Second Interviews

In its earlier discussion, the court recited the documentary evidence detailing Mr. Danser's movements between the first interview on the afternoon of May 21 and the second interview on the afternoon of May 22. The jail log indicates that Mr. Danser made at least one telephone call on the evening of May 21. (Gov't Ex. 12, at 3.) The jail log also indicates that Mr. Danser met with his attorney for over an hour on the morning of May 22. (Gov't Ex. 13 at 3.) Also according to the log, in the early afternoon on May 22, Mr. Danser made an appearance before a judge. (*Id.*) This court finds that all of these events happened as detailed in the logs.

The court further finds that at some point on May 22—most likely at the hearing before the judge—Mr. Danser was given a copy of the Probable Cause Affidavit that was completed and signed by Det. Swain on May 21. The court's finding is based upon an examination of the videotape of the second interview and a comparison to the Probable Cause Affidavit. The videotape begins with Mr. Danser reading a document. As he runs his finger along the lines of the document, he looks up and says to Det. Swain, "[Mr. Danser's wife] said she found a picture of me naked holding [Karen Doe]." (Gov't Ex. 2B at [1].) The first statement in the Probable Cause Affidavit is that Mr. Danser's wife called the police and showed them "a photograph of David Danser nude and [ ] seven year old [Karen Doe], also nude, and sitting on his lap." (Gov't Ex. 15.)

The videotape continues as Mr. Danser looks back down at the document and quickly looks up again and makes a comment about his wife calling the police about the photographs. (Gov't Ex. 2B at [1].) He then begins reading again, and while still reading, says, ". . . search warrant." (*Id.*) Then he looks up and says, "Okay. If you know, you have seen a whole mess of stuff that I suppose is mine." (*Id.*) On the Probable Cause Affidavit, after the statement about Mr. Danser's wife calling the police about the picture, it says, "Deputy Rudder obtained a telephonic

Search Warrant and located in the home[ ] a large amount of pornographic material including dozens of photographs of children who were naked." (Gov't Ex. 15.)

Later on the videotape, Mr. Danser commences reading the document again, and says, "[By the way,] you just mentioned [here that] the camera is located in three different locations...." (Gov't Ex. 2B at [7].) After the statement about the search warrant, the Probable Cause Affidavit says, "The indication from viewing the video tape showed that it was likely to have been made from a hidden camera from three different locations." (Gov't Ex. 15.)

The conclusion the court draws from this analysis is that the document Mr. Danser was reading during the second interview is a copy of the Probable Cause Affidavit. The court could recite other examples bolstering this conclusion, but the conclusion is sufficiently supported by the listed examples.

The court concludes that Mr. Danser received the copy of the Probable Cause Affidavit—either from his attorney or the judge—while Mr. Danser was at the court appearance between 1:25 p.m. and 1:52 p.m. on May 22. Because of the Affidavit (and perhaps other documents or events in court), Mr. Danser became agitated and convinced that his wife was trying to "frame" him. He asked a jail officer to tell Det. Swain that he—Mr. Danser—wished to talked to him.

These findings are directly supported by the testimony of Det. Swain, who testified that Mr. Danser initiated the second interview via a jail officer. They are further supported by the content of the second interview. Mr. Danser was animated and obviously attempting to convince Det. Swain that his wife, and also another individual, were trying to "frame" him. For example, he tells Det. Swain at one point, "See I'm being framed[;] you are a tool sir being used to steal my entire estate. That's what they're doing. That's all they're doing.... I can guarantee it."

(Gov't Ex. 2B at [11].) Det. Swain asked very few questions in the interview and Mr. Danser was clearly controlling the pace and direction of the conversation. Focusing on just the words spoken by Det. Swain in the second interview vividly demonstrates that it is unlikely Det. Swain initiated the interview. The first utterance from Det. Swain was, "Uh, huh." Indeed, the following is a listing of everything Det. Swain said in the first three pages of the interview:

Uh, huh. [Mr. Danser speaks.] Uh, huh. [Mr. Danser speaks.] You know under normal circumstances that might be as insignificant as you... [Mr. Danser speaks.] Oh, I see. You're saying... [Mr. Danser speaks.] Well I can see that. [Mr. Danser speaks.] Where's that at? [Mr. Danser speaks.] Sure. [Mr. Danser speaks.] I'm not sure what you're, what titles? [Mr. Danser speaks.] Um, okay. [Mr. Danser speaks.] "Okay. Uh, yeah I'll confer with have your attorney get in touch with me, I'll get in [touch] with the Prosecutor's Office. [Mr. Danser speaks.] Okay? [Mr. Danser speaks.] Can you label that as soda pop room? [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] I've been in there just for a brief time. [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] How did it get there? [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] What is that? [Mr. Danser speaks.] Okay. [Mr. Danser speaks.] Photography work.

(Gov't Ex. 2B at 1–3.) These simply are not the type of opening statements/questions of one who has initiated an interview. All of these facts tend to show that Mr. Danser initiated the second interview, and did so because of his anger with his wife (and later, another individual as well).

The court finds Mr. Danser's testimony that he did not initiate the second interview not to be credible. The facts discussed above contradict Mr. Danser's testimony. Further, his demeanor on the witness stand[15] during the suppression hearing supports this conclusion. At one point Mr. Danser testified that he asked a jailer to contact Det. Swain on his behalf, but could not say exactly when he did this. Then he testified, with some hesitation, that he did not initiate either of the two taped interviews with Det. Swain. Later, he testified that he only had two interviews with Det. Swain, and that he never thought he had three. Mr. Danser left unexplained what happened on the occasion he asked for Det. Swain. His hesitation, and otherwise unconvincing demeanor when testifying on this issue, undermines his credibility—especially when contrasted with Det. Swain's credible and unequivocal testimony that Mr. Danser initiated the second interview.

#### F. The Second Interview

The court has already found that Mr. Danser initiated the second interview, and that he did so because of anger toward his wife. Mr. Danser testified at the suppression hearing that during the interview, he told Det. Swain about the location of the lockbox because "[Det. Swain] said he needed it." He further testified that he told Det. Swain the location of the lockbox in order to protect Karen Doe from having to testify. The court does not find these assertions to be credible.

The videotape demonstrates that Mr. Danser raised the issue of the lockbox without any prompting from Det. Swain. Instead, Mr. Danser was reading the Probable Cause Affidavit, which appeared to spark in his memory that he possessed similar photos which could implicate his wife. Det. Swain only asked Mr. Danser

where the photos were after Mr. Danser first raised the issue, and Det. Swain never said he "needed the box." Mr. Danser's motivation for revealing the location of the box became clear after he described where the box could be located and the photos that could be found inside; he explained that his wife "was holding the light for me that night ... while I shot the different pictures in different areas and angles.... Uh, huh. Um, let's see[,] she knew about every bit...." (Gov't Ex. 2B at 4.) Nowhere in the entire interview does Mr. Danser voice any concern for Karen Doe's well-being. But on numerous occasions, Mr. Danser indicates his desire to incriminate his wife. Also, on one occasion, he indicates concern for his own well-being: "[I]f there's a way that you could save me any extra pain from me telling ... you this I would appreciate it." (*Id.*)

The court also finds Mr. Danser's testimony not credible when he testified that before Det. Swain turned on the videocamera for the second interview, Det. Swain told Mr. Danser that his cooperation would be helpful to Karen Doe. Det. Swain testified that he had no discussions with Mr. Danser about Karen Doe before turning on the videocamera for the second interview. The court finds Det. Swain's testimony to be more credible than Mr. Danser's testimony on this point. As discussed above, Mr. Danser appeared to be completely focused on incriminating his wife in the second interview, which is inconsistent with someone who has just been told that cooperation would help Karen Doe. Further, Mr. Danser initiated the second interview, so Det. Swain would have no reason to admonish Mr. Danser on this point because he would have no idea why Mr. Danser initiated the interview.

With respect to Mr. Danser's demeanor during the second interview, the court

---

**15.** Despite his persistent complaints about the conditions in the Marion County Jail (where he is being detained pending trial), he seemed extremely alert, responsive and articulate during the suppression hearing, as he has during other hearings before this court. His level of alertness while on the witness stand in the suppression hearing appeared similar to his level of alertness during his videotaped interviews with Det. Swain.

finds him to have appeared alert, energetic and in full control of his faculties.

A final point is that at the end of the second interview, Det. Swain indicated that he needed to go out to Mr. Danser's store and look for the lockbox in the location Mr. Danser described in order to "establish credibility." He made these statements after Mr. Danser described in detail where the box could be found, and after he made all of his inculpatory statements.

## II. Legal Conclusions

Mr. Danser contends that the overall coercive atmosphere surrounding the arrest, confinement and interviews rendered his statements to Det. Swain involuntary.

█ "A confession is voluntary if, in light of the totality of the circumstances, the confession is the product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir.1998) (citing *Watson v. DeTella*, 122 F.3d 450, 453 (7th Cir.1997)); *see also United States v. Sablotny*, 21 F.3d 747, 750 (7th Cir.1994); *United States v. Haddon*, 927 F.2d 942, 945 (7th Cir.1991). The government bears the burden of showing that a confession is voluntary by a preponderance of the evidence standard. *See Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). "[T]he test for voluntariness of the statement is whether the claimed impairments caused the defendant's will to be overborne." *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir.1997). "The issue of coercion is determined from the perspective of a reasonable person in the position of the suspect." *Id.* (citing *United States v. Fazio*, 914 F.2d 950, 955 (7th Cir.1990)).

█ In making the determination of whether a statement is voluntary or coerced, courts in the Seventh Circuit consider both the defendant's personal characteristics as well as police conduct toward the defendant. *See Brooks*, 125 F.3d at 492. The personal characteristics of a defendant that the court should consider include: the defendant's age, education, experience with the criminal justice system, intelligence level, mental state, narcotics, alcohol and fatigue. *See id.; Watson*, 122 F.3d at 453. The police conduct that the court should consider include: the length of defendant's detention, the nature of the interrogations, the inclusion of advice about constitutional rights, and the use of physical punishment, including deprivation of food or sleep. *See Brooks*, 125 F.3d at 492. "Absent a showing of some type of official coercion, however, a defendant's personal characteristics alone are insufficient to render a confession involuntary." *Watson*, 122 F.3d at 453 (citing *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)); *see also Dillon*, 150 F.3d at 757 (" '[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.' ") (quoting *Connelly*).

█ Mr. Danser's attorney emphasizes the following personal characteristics of Mr. Danser: he had no prior experience with police officer interrogations; he had only a ninth or tenth grade education; he was sleep deprived; and he was still shaken from his arrest. In response, the Government raises the issue of Mr. Danser's previous arrest on a child molestation charge in 1972 or 1973, at which time he spent seven or eight days in jail. As the court noted above, while this does not amount to a great deal of experience in the criminal justice system, it is probably more experience in the system than most people have experienced. The Government also notes that even by Mr. Danser's testimony, these charges are not surprising to him: he also testified that he "had a long time to adjust to the idea that some day [he] might be called to account for [his] conduct in molesting children," and "it was no great surprise to [him] when it finally hap-

pened." And despite Mr. Danser's limited education, he has a high I.Q., is well above the age of majority, and has performed jobs requiring substantial intelligence and mental acuity. *Cf. Watson,* 122 F.3d at 456 ("Watson's personal characteristics also fail to convince us he was disadvantaged by 'youthful ignorance or the naivete born of inexperience.' Although Watson was 17 years old and had only attended high school for 8 months at the time of his arrest, we have rejected similar challenges brought by young defendants with even less education.") (citing *Weidner v. Thieret,* 932 F.2d 626, 627–28 (7th Cir.1991) (finding confession made by 17–year–old defendant with an eighth grade education and who claimed to have suffered brain damage due to frequent drug use was voluntary)). In the end, the court finds that these personal characteristics do not weigh heavily in any one direction.

As for Mr. Danser's claim that he was sleep deprived or still shaken from the arrest, the court "applie[s] a balancing test to claims of an impaired mental state from various causes." *Sablotny,* 21 F.3d at 751. "The question is whether [Det. Swain] should reasonably have known that [Mr. Danser] was unusually susceptible to psychological pressure. If mental impairment of whatever kind should have reasonably been apparent to the interrogator[ ], special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary." *Id.* at 752. As mentioned in the factual discussion, Mr. Danser never told Det. Swain (or anyone else) about his inability to sleep. And while he did begin to tell Det. Swain how he was upset with the way the officers treated him at his arrest, he became sidetracked and changed the subject mid-way through his story. (Gov't Ex. 2A at 34–37.) In the description, he appeared perturbed and even angry about the arrest,

but there is no indication that he was laboring under a mental impairment because of the incident—which occurred some 36 hours before the first interview. At the suppression hearing, Mr. Danser testified that he "was brutalized" by the arresting officers, and was in a state of "total shock" due to the arrest. He testified that not only did this state of "total shock" continue through the time of the interviews, but it "stays with [him] today." His testimony on this subject bordered on the histrionic, and was not entirely credible. The court finds that at the time of the interviews, he was angry about the arrest, but his anger was not so severe as to affect his free will.

And even if Mr. Danser could be characterized as suffering from a mental impairment at the time of either interview, it certainly is not apparent from the videotapes. As discussed above, in both interviews, Mr. Danser appeared alert, clear-witted, attentive and communicative. He appeared fully aware of his situation and did not appear particularly nervous or intimidated by Det. Swain. In short, the court finds that Det. Swain had no reason to suspect that Mr. Danser was suffering under any mental impairment.[16] *See Brooks,* 125 F.3d at 493 (affirming district court's conclusion that statement was voluntary in part because "the district court found that the FBI agent had no reason to suspect that Mr. Brooks was suffering from sleep deprivation, an excess of pain or the influence of drugs.").

With respect to the police conduct, the court notes that normally it would be troubled by the 36–hour gap between the time of Mr. Danser's arrest and the first interview. However, under the specific facts of this case, the court finds it less so. There clearly were extenuating circumstances in Mr. Danser's case that necessitated an im-

---

**16.** To the extent Mr. Danser still contends that he was deprived of food (it appeared at the suppression hearing that he may have abandoned that claim), the same analysis would apply. Mr. Danser testified that the jailors "did everything they could to give [him] food" but he did not eat because of his anxiety. However, there was no reason for Det. Swain to suspect that Mr. Danser was deprived of food.

mediate arrest of Mr. Danser in the early morning hours of May 20—Mr. Danser had indicated he was suicidal; he was locked in a hotel room with one of his alleged molestation victims; and he was armed with at least two handguns. Because of these extenuating circumstances, the police were forced to act quicker than perhaps they normally would, and thus Det. Swain was forced to do his initial background fact-finding during the day of May 20. This fact-finding included a talk with Mr. Danser's wife and interviews with at least three of his alleged victims. Because of the delicate nature of the subject matter, interviews with alleged victims of child molestation can be difficult and time-consuming. Also on May 20, Det. Swain searched Mr. Danser's residence and his business and secured numerous items of evidence from each location.

Furthermore, it appears that simply by virtue of the materials found in the motel room at the time of Mr. Danser's arrest, the police had enough evidence to hold and charge him with child molestation and/or child pornography. There is no evidence that the delay was created for the purpose of coercing a confession.

Also, despite Mr. Danser's current contentions, the court has found that he was treated reasonably well in the jail: he was given food, clothes, bedding, showers, medical attention and access to the phone. And Mr. Danser had been previously arrested and jailed on a child molestation charge. He testified that he waited *seven or eight days* in jail without being interviewed by the police. Therefore, in Mr. Danser's eyes, the delay should not have seemed unusual.

And finally, Mr. Danser did not testify that he was harmed by the delay. He also did not complain about the delay to Det. Swain in either interview. In other words, according to the evidence, the delay appeared justified and Mr. Danser did not appear to suffer any prejudice as a result of it. *See United States v. Mullin*, 178 F.3d 334, 342 (5th Cir.1999) ("[W]here there is no evidence to support a finding that the delay was for the purpose of obtaining a confession, there is no evidence that the delay had a coercive effect on the confession, there is no causal connection between the delay and the confession, and the confession was otherwise voluntarily given ... the defendant has not shown prejudice by the delay.") (quotation omitted); *cf. United States v. Gaines*, 555 F.2d 618, 622 (7th Cir.1977) ("Impliedly, at the very least, we have required a defendant to establish that a delay [between arrest and presentment before a judge] 'was deliberately induced for the express purpose of producing evidence.'") (quoting *United States v. Hamilton*, 409 F.2d 404, 406 (7th Cir.1969)).

And when the court considers the other factors relating to police conduct, the importance of the delay diminishes even further. Mr. Danser was not physically punished in any way at the jail. At the time of the arrest, the officers used an appropriate amount of force given the circumstances—it is not unreasonable for an officer to push a suspect to the ground if they see the suspect attempting to draw a gun at him. Indeed, had the officers taken a split-second longer to ram the door open, allowing Mr. Danser time to withdraw his firearm from its case, the officers may well have been justified in using deadly force against Mr. Danser.

Mr. Danser was advised of his constitutional rights at the beginning of the first interview and was reminded of those rights during the second interview. Mr. Danser has not contended that the advice of rights was defective in anyway. He also does not appear to contest (apart from his general challenge of the voluntariness of his inculpatory statements) that he understood those rights and freely waived them.

The overall nature of Det. Swain's interrogations of Mr. Danser also militates toward a finding of voluntariness. Det. Swain was non-confrontational, non-threatening and respectful toward Mr. Danser.

He generally allowed Mr. Danser the freedom to talk about subjects Mr. Danser wished to discuss, and allowed Mr. Danser to change the subject when Mr. Danser wished to do so. And the length of each interview was reasonable—the first was approximately an hour and the second was significantly shorter.

 Mr. Danser now contends that certain specific statements and/or interviewing strategies of Det. Swain had a coercive effect on him. "Interrogation strategies ... do not automatically render a confession involuntary. Their use must instead be considered in conjunction with the rest of the circumstances surrounding a confession to determine whether the confession is voluntary." *Stawicki v. Israel*, 778 F.2d 380, 383 (7th Cir.1985) (citation omitted).

First, Mr. Danser points to Det. Swain's statements in the first interview: "[Y]ou're in a position to where I think your willingness to cooperate and talk about your problem that you have, I think can, in the long run, be beneficial to you, ah, that's my viewpoint.... [Y]our fast talking won't work, all you can do, my viewpoint is, is the best thing you can do is be totally upfront about everything." (Gov't Ex. 2A at 2–3.) In *United States v. Rutledge*, 900 F.2d 1127, 1130–31 (7th Cir.), *cert. denied*, 498 U.S. 875, 111 S.Ct. 203, 112 L.Ed.2d 164 (1990), the court held that an arrestee's post-*Miranda* confession as to the amount of drugs with which he had contact was voluntary even though police had told him that "all cooperation is helpful." The court stated:

> The policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible.
>
> An alternative interpretation of the officer's statement [that "all cooperation is helpful"], however, is that it promised Rutledge a net benefit from spilling the

beans. If this was the promise, it is unlikely that the officer intended to keep it; and if he did not, then the statement was fraudulent. But it was the sort of minor fraud that the cases allow. Far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits not exceeded here.

*Id.* (citation omitted). Det. Swain's statements to Mr. Danser are similar to the challenged statement in *Rutledge*, except that unlike in *Rutledge*, Det. Swain repeatedly qualifies his statements about the benefits of cooperation as being his own opinion or "viewpoint." In other words, Det. Swain's statements "promise" less than the statement in *Rutledge*. And to the extent Mr. Danser mistakenly (but unreasonably) believed that Det. Swain was "promising" him immunity or even leniency, this does not render his inculpatory statements involuntary. *See Pharr v. Gudmanson*, 951 F.2d 117, 120 (7th Cir. 1991) ("That Mr. Pharr mistakenly believed that the promise of the Fox Point police officer referred to all state charges is insufficient to render his confession involuntary.").

But as a factual matter, it appears Mr. Danser was well aware that Det. Swain had not guaranteed him leniency. In the second interview, Mr. Danser stated, "[I]f there's a way that you could save me any extra pain from me telling ... you this I would appreciate it." (Gov't Ex. 2B at 4.) Det. Swain's response was, "Well I'm certainly gonna let the Prosecutor's Office know that you're telling me about this. (*Id.*) This is a proper promise for an officer to make:

> It is not improperly coercive conduct for an officer to tell a suspect that the prosecutor will be informed of his cooperation and will evaluate his case in light of his cooperation. An officer's statement or promise to a defendant that the prosecutor would be told of the defendant's cooperation does not transform a defen-

dant's otherwise voluntary statement into an involuntary one.

*United States v. Westbrook,* 125 F.3d 996, 1005 (7th Cir.1997) (citations omitted); *see also United States v. Dillon,* 150 F.3d 754, 758 (7th Cir.1998) ("Dillon also contends that his statements were involuntary because the agents promised to bring any cooperation on his part to the prosecutor's attention.... Contrary to Dillon's pleas of coercion, however, we have repeatedly upheld this tactic as one that allows a defendant to make a rational decision.") (citations omitted).

Mr. Danser also contends that Det. Swain's statement, "we don't want [Karen Doe] to be [hurt] by you... saying she's a liar or anything," *see* Gov't Ex. 2A at 11, was improperly coercive. Mr. Danser testified that he understood Det. Swain to mean that "the reason why there would be injury [to Karen Doe] is because [he] might have contradicted her claim [he] molested her." While this obviously is an appeal to Mr. Danser's emotions, there is no dispute that the statement is true—it would likely be traumatic for Karen Doe to testify about the molestation and have Mr. Danser call her "a liar." Furthermore, this is an intrinsic consideration that a suspect in Mr. Danser's position would have in rationally deciding whether to confess. A rational person in Mr. Danser's shoes would factor in his decisionmaking process the fact that if he confessed fully, Karen Doe either would not need to testify in court, or would not have as traumatic an experience as she would have if Mr. Danser denied Karen Doe's story (and, presumably, cross-examined her vigorously on the subject). The court notes that the potential power of this consideration is affected dramatically by whether the allegations against Mr. Danser are true—if Karen Doe's story is true, then Mr. Danser would know that the traumatic effect

of him "saying she's a liar" would be great; but if her story is not true, then the traumatic effect of "saying she's a liar" would not be so great because she would know that he is correct. Therefore, Det. Swain's statement about Karen Doe is a truthful statement that points out an intrinsic consideration that anyone in Mr. Danser's situation would confront in making a rational decision about whether to confess. In *Holland v. McGinnis,* 963 F.2d 1044 (7th Cir.1992), the court held that minor police misrepresentations relating to intrinsic concerns (such as whether the suspect is guilty or whether the police have gathered enough evidence linking him to the crime) are permissible, but misrepresentations interjecting completely extrinsic considerations (such as an "empty but plausible threat" to take away a suspect's welfare benefits for the suspect and her children if she did not confess) are impermissibly coercive. *See id.* at 1051–52. In this case, Det. Swain's statement relates to intrinsic concerns. And unlike the police statement in *Holland,* Det. Swain's statement was *not* a misrepresentation. Therefore, it cannot be said to have interfered with Mr. Danser's "'free and deliberate choice' of whether to confess." *Id.* at 1051 (quoting *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).[17]

Finally, Mr. Danser's counsel raised two subjects during Det. Swain's cross-examination, but did not mention the subjects in his argument at the end of the suppression hearing. First, he raised the issue of Det. Swain's comments in the first interview that he "doubt[ed]" the authorities in North Carolina would be interested in Mr. Danser's activities with Karen Doe in Wilmington, North Carolina. Second, he raised the issue of Det. Swain's comments in the second interview that he needed to look for the lockbox in order to "establish

---

**17.** The court notes that fact that Det. Swain's statement may have *caused* Mr. Danser to make certain statements in the first interview is not determinative: "causation alone does not constitute coercion; if it did, all confes-

sions following interrogations would be involuntary because it can almost always be said that the interrogation caused the confession." *Holland,* 963 F.2d at 1051 (quotation omitted).

credibility." The court finds that neither of these statements were improperly coercive. Furthermore, neither of these comments could be said to have even caused (let alone coerced) [18] Mr. Danser to provide any information: Det. Swain's comments about North Carolina were made *after* Mr. Danser had described his activities in North Carolina. Immediately after Det. Swain made his comments, he changed the subject of the interview to a different topic. Det. Swain's comments about establishing credibility were made at the conclusion of the second interview, after Mr. Danser described where the lockbox could be found and after Mr. Danser made all of his inculpatory statements.

Considering the totality of the circumstances, the court finds that Mr. Danser's statements during the first and second interviews were the product of a rational intellect and free will rather than any abuse, intimidation or deception by Bloomington police officers and/or jailers. While the circumstances of his arrest and imprisonment certainly annoyed and even angered Mr. Danser, this annoyance and anger were not so pronounced as to cloud or overbear his intellect and free will. Mr. Danser's demeanor on the videotapes demonstrate that he was lucid, alert and responsive. While Det. Swain employed some interview strategies designed to elicit information, those strategies were not of the character to, and did not as a factual matter, interfere with Mr. Danser's free will and ability to make a rational decision. In short, the totality of the circumstances weighs overwhelmingly in favor of finding a voluntary confession.

### III. Conclusion

The court finds that Mr. Danser's statements to Det. Swain were voluntary. Because of this finding, the court does not reach the Government's argument that the lockbox would inevitably been discovered

even without Mr. Danser's statements. Mr. Danser's Motion to Suppress is **DE-NIED**.

---

**18.** While causation alone is not sufficient for a finding of coercion, *see* footnote 14, it is